## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |
|---|---|
| STONE HILTON PLLC, a Texas professional limited liability company; JUDD STONE; and CHRIS HILTON,<br><br>    Plaintiffs,<br><br>v.<br><br>BRENT WEBSTER, in his individual capacity; RALPH MOLINA, in his individual capacity; and JOSH RENO, in his individual capacity,<br><br>    Defendants. | Civil Action No. 1:25-cv-00983<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

1.  Brent Webster is a petty tyrant who uses the authority of his office to enrich himself and punish his enemies. As First Assistant Attorney General, Webster is effectively in charge of the Office of the Attorney General ("OAG") on a day-to-day basis. He wields that authority with little regard for his responsibility to abide by the Constitution or follow the law. Webster thinks nothing of engaging in criminal or unlawful acts if the ends justify the means; Webster's ends are always personal, and he cares for nothing other than what is best for him.

2.  Webster's demands support for his misdeeds to create a veneer of legitimacy, rewarding those who comply and punishing those who resist. Those who dare to speak up prominently against Webster face isolation, demotion, and threats. Those who cooperate are rewarded through promotions and the satisfaction that compliance and job security go hand-in-glove.

3.      Judd Stone and Chris Hilton formerly worked underneath Webster at OAG until they left the agency to defend Ken Paxton in his impeachment trial. During their tenure at OAG prior to Attorney General Paxton's impeachment, both Stone and Hilton were regularly called upon by Webster to advise General Paxton and other key staff on virtually all of OAG's most sensitive matters. They often worked in close quarters with General Paxton, Webster, and other critical agency personnel, with no expression of concern for the safety of anyone involved. If Webster had any complaint about the presence of Stone and Hilton, it was that they were not even *more* personally and immediately available to respond to his round-the-clock demands. Stone and Hilton have since moved on to their law firm, Stone Hilton PLLC. But because of personal and political disagreements with Webster, who views expressions of disagreement as evidence of disloyalty that must be eradicated, Stone and Hilton have been subjected to Webster's retaliation time and again.

4.      Most recently, Webster abused his office and conspired with his top lieutenants, Ralph Molina and Josh Reno, to draft a false and defamatory email that alleges Stone and Hilton engaged in and admitted to sexual harassment. *See* Ex.B, DOC 10-2. That email is a lie, but Webster's fabrication could not have come to life without Molina and Reno. Their self-interested decision to participate in Webster's lie by helping concoct it, bolstering it, and amplifying it had no legitimate purpose. It served only to further the shared scheme of Webster and his co-conspirators to advance their interests at Plaintiffs' expense. In the defamatory email, Webster goes on to make a number of other false allegations that would normally be too ridiculous to warrant a response. But because Webster abused the power of his office to spread his lies and falsely represented his slander as an official OAG investigation, Webster, Molina, and Reno achieved their true purpose: to punish Stone and Hilton because of Webster's personal vendetta against those who dare speak against him.

5.      Plaintiffs file this case to expose Brent Webster and his crimes, to demand repayment for the economic and noneconomic harms Webster, Molina, and Reno have inflicted on the firm and its principals, and to insist that Webster and his co-conspirators be punished to the fullest extent that federal law, Texas law, and a jury will allow.

## PARTIES

6.      Plaintiff Stone Hilton PLLC is a Texas professional limited liability company with its principal place of business in Austin, Texas.

7.      Plaintiff Judd Stone is an individual residing in Austin, Texas. He is one of the founding partners of, and an owner of, Stone Hilton PLLC. Stone has owned his membership interest in Stone Hilton PLLC throughout all times relevant to this lawsuit and is able to fairly and adequately represent the interests of Stone Hilton PLLC.

8.      Plaintiff Chris Hilton is an individual residing in Austin, Texas. He is one of the founding partners of, and an owner of, Stone Hilton PLLC. Hilton has owned his membership interest in Stone Hilton PLLC throughout all times relevant to this lawsuit and is able to fairly and adequately represent the interests of Stone Hilton PLLC.

9.      Defendant Brent Webster is an individual who, on information and belief, resides in Williamson County, Texas. He is currently employed as the First Assistant Attorney General of the Office of the Attorney General of Texas. He is sued in his individual capacity.

10.      Defendant Ralph Molina is an individual who, on information and belief, resides in Austin, Texas. He is currently employed as the Deputy First Assistant Attorney General of the Office of the Attorney General of Texas. He is sued in his individual capacity.

11.     Defendant Josh Reno is an individual who, on information and belief, resides in Lubbock, Texas. He is currently employed as a Deputy Attorney General in the Office of the Attorney General of Texas. He is sued in his individual capacity.

## JURISDICTION & VENUE

12.     This Court may exercise subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

13.     This Court may exercise personal jurisdiction over all Defendants because all defendants are Texas residents.

14.     Venue is appropriate here as all defendants reside in this State and most reside in this district, 28 U.S.C. § 1391(b)(1), and most of the events and omissions giving rise to the claims in this case occurred in this district (and division), *id*. § 1391(b)(2).

## BACKGROUND

15.     Brent Webster, a former Williamson County prosecutor, took power at OAG in October 2020 after the departure of former First Assistant Attorney General Jeff Mateer and other former OAG executives who had accused Texas Attorney General Ken Paxton of wrongdoing in office.

16.     Josh Reno is a longtime Webster confidant who served as a prosecutor in Lubbock before joining OAG. Reno became Deputy Attorney General for Criminal Justice in October 2020, roughly around the same time as Webster. Also like Webster, Reno was hired to replace another former OAG official who had accused General Paxton of wrongdoing. In his role overseeing Criminal Justice for OAG, Reno is responsible for all agency security and law enforcement. It is the job of the Deputy Attorney General for Criminal Justice to oversee the Office of the Attorney

General's criminal law functions, including supervision of investigations and prosecutions, support for local law enforcement, and assistance in cold case investigations.

17.    In practice, however, because of Webster's prosecutorial background, Webster exerts practical control over law-enforcement decisions. Reno's functional role is to be Webster's enforcer, loyally carrying out Brent Webster's law-enforcement agenda. Reno's official job duties do not include conspiring with others or otherwise acting to thwart individuals' constitutional and statutory rights. Such actions are intended to benefit Webster personally and Reno vicariously, and do not further any legitimate purpose of OAG.

18.    Ralph Molina currently serves as Deputy First Assistant Attorney General. Webster has long rewarded Molina for unquestioning loyalty to him, first by elevating Molina from his position as a junior OAG line lawyer, then by inviting Molina to fill the role of Deputy Attorney General for Legal Strategy, and ultimately promoting Molina to Deputy First Assistant. Upon information and belief, Molina is entirely dependent on the good graces of Brent Webster for advancement in his professional career.

19.    While at OAG, Judd Stone served as Solicitor General and Chris Hilton served as Chief of the General Litigation Division. As Solicitor General, Stone was responsible for overseeing the State of Texas's appeals, including handling matters before the U.S. Supreme Court. As Chief of General Litigation, Hilton was responsible for overseeing a division of as many as 70 employees who were handling hundreds if not thousands of cases. In view of Webster's relative inexperience with civil litigation, Texas public policy, trial practice, complex motions, emergency litigation, election and campaign law, constitutional legal issues and federalism, legal strategy, appellate and Supreme Court practice, legal ethics, and negotiation, Webster relied heavily on Stone and Hilton for advice and counsel throughout their respective tenures.

20.     As the principals of Stone Hilton PLLC, however, Stone and Hilton came to share a mutual enmity with Webster rooted in the actions Webster undertook during Plaintiffs' representation of Attorney General Ken Paxton in his impeachment trial. Stone and Hilton have reported all relevant details to the State Bar and the appropriate authorities, and they are broadly outside the scope of this action. Suffice it to say that during their defense of the Attorney General, Stone and Hilton observed and otherwise learned that Webster committed state and federal crimes before and throughout the impeachment process; that Webster's response to being confronted with these concerns—including lying and retaliation—made it impossible for the three to work together at OAG; and that Webster would stop at nothing to protect his own position of power by harming Stone and Hilton, whom he began to perceive at threats because of their speech.

21.     Webster's deviant self-interest has never stopped at skirting accountability for his crimes. Webster has also long attempted to ingratiate himself with law firms he believed might employ him after his tenure as First Assistant Attorney General ends. On information and belief, law firms that Webster perceives as disobedient or disloyal will be shut out or impeded in doing business with or representing clients before the State. Harming Stone Hilton would preserve opportunities for competitors of the firm that Webster perceived as potential landing spots after his tenure as First Assistant ended.

22.     Since their departure from OAG, Webster disparaged Plaintiffs repeatedly inside and outside OAG in an attempt to negatively impact the firm's business. Webster's retaliation against Stone and Hilton for speaking out against him was calculated to—and did—negatively impact Plaintiffs' ability to capitalize on their years of combined experience at OAG. Webster thus harmed Stone and Hilton's business by impeding the ability of Plaintiffs' firm to compete for

business, reducing its market share, and devaluing the marketability of Stone's and Hilton's experience.

23.     At first, Stone and Hilton took Webster's actions in stride. Stone and Hilton continue to enjoy a good relationship with Attorney General Paxton, despite Webster's best efforts, and they assumed that with the pressure of impeachment behind them, eventually tensions would subside. Plaintiffs hoped that Webster's disrespect for his principal and his Agency would ease over time. As it turned out, Webster had no intention of letting go of the petty, personal grudge he harbored against Stone and Hilton for daring to speak out against his wrongdoing.

24.     In November 2024, Webster escalated his attacks. After learning that Stone Hilton had reached an agreement in principle with a prospective client for a potentially six-figure engagement, Webster used his official authority within OAG to communicate to the client that they should not hire Stone Hilton. Faced with the risk of dire consequences for defying a direct request from the First Assistant Attorney General, the client complied. No longer was Webster content merely to cause Plaintiffs economic damage by slandering them, it seemed; Webster had targeted Plaintiffs using his official capacity to cause them tangible economic harm and further impede their firm's market share and ability to compete.

25.     This was a bridge too far. By November 2024—when Webster tortiously interfered with this prospective client engagement—Plaintiffs had already endured over a year of economic harm from Webster's spiteful meddling. Stone and Hilton believed that Webster had likely engaged in a pattern of exploiting OAG for his personal and financial benefit; they had now been the direct targets of his official oppression; they agreed that this pattern deserved further investigation and that Webster should be stopped.

26.     To that end, Stone and Hilton agreed that the best course of action would be to exercise their right to request documents from OAG that tended to substantiate what they had seen first-hand: that Webster used OAG to enrich himself and pursue his self-serving vendettas and interests at the State's expense. Stone and Hilton drafted and submitted an appropriate request under the Public Information Act on November 27, 2024, and expected they would use the documents they received as part of a case to the Attorney General—and, if needed, the public— regarding Webster's corruption. That request was thorough and professional; Stone and Hilton had advised on and litigated many Public Information Act issues. *See* Ex.A, DOC 10-1.

27.     On receipt of the request, Webster was apoplectic. Over the course of the next several days, Webster held over a dozen meetings with various members of the executive staff— especially Ralph Molina and Josh Reno—as to how to harm Plaintiffs to the greatest extent possible. Their avowed, mutual goal was to harm the firm and its principals because they had sought information made accessible to the public by statute that would have tended to show Webster's corruption. They overtly discussed "retaliation" in exactly that language.

28.     Webster decided that the most effective course of action would proceed in three steps, each of which involved the participation of Reno and Molina. First, Webster fabricated an official document—the December 2024 email—that lied about wrongdoing by Stone and Hilton. Despite the fact that they had departed OAG fifteen months earlier, he wrote this email to retroactively change the reason for their separation from OAG to termination because of allegations of sexual harassment. That Stone and Hilton categorically deny any such accusations was of no moment: Webster decided to lie and claim that Stone and Hilton had admitted these allegations. Webster thought nothing of fabricating official documents if it meant advancing his grudge against Plaintiffs to punish them for speaking out.

29.     Webster wrote the email to Reno and Molina based on a completely pretextual appeal to his personal safety. In it, Webster claimed to be concerned about his physical safety from Stone, despite the two not having exchanged words directly in over a year and despite the utter absence of any physical threat from one to the other. Put bluntly, Webster's safety concerns were and are a lie—and a lie that is costing the Texas taxpayers money as we speak. Upon information and belief, Webster enjoys a security detail at his home based on these consciously false pretenses to this day. Reno and Molina were active participants in this deception and falsified additional documents to bolster Webster's absurd claims. But all of their actions were pretextual lies: Webster's email *stated on its face* that it had been composed in response to Stone Hilton's public information request.

30.     The implausibility of Webster's so-called safety concerns reveals the necessary participation of Reno and Molina in the scheme. Stone's longstanding history of working in close personal proximity to Webster, Reno, and Molina for years undercut any notion that Stone posed any physical threat to Webster. To get around this obvious flaw in Webster's malicious hitjob, Webster concocted a number of salacious allegations, including that Webster harbored a new fear that Stone allegedly wished him to suffer an "asteroid" strike. Upon information and belief, Webster, Reno, and Molina understand how asteroids work and understand that Stone cannot summon them to strike his foes.

31.     Reno and Molina further participated in the scheme by helping Webster tie his lie about security concerns to the OAG employment of Stone and Hilton and their work on the Paxton Impeachment. Webster implicated Reno as purportedly having recollection of allegations against Stone and Hilton concerning their OAG employment and regarding previous security measures OAG took for Stone's own safety. Similarly, Webster implicated Molina as having witnessed

allegations about Stone made by an OAG employee returning to the agency after the impeachment. It is Webster's common practice for such a writing to memorialize an agreement in principle already discussed among the recipients of such a document.

32.    Here, the email reflects a clear scheme to harm Stone, Hilton, and their firm: Webster would utter the lie, Molina and Reno would corroborate the lie, and then Reno would use his OAG law-enforcement authority to give Webster's security concerns a stamp of approval. In view of Reno's law-enforcement experience and long history of working with Stone and Hilton, Reno knew or should have known that there was no actual security threat from Stone or Hilton to assess, and thus performed no genuine threat assessment. Upon information and belief, Reno instead authorized a security detail for Webster to give cover to Webster's lie about safety concerns. Webster, Molina, and Reno all knew or should have known that fraud, waste, and abuse of taxpayer resources would violate OAG policy or Texas law. Yet they each disregarded their duties in service of their shared purposes to harm Plaintiffs because they each viewed Stone and Hilton's speech as a threat to their own careers and job security.

33.    Second, Webster filled his email with as many salacious accusations as possible in order to ensure maximum media coverage and therefore maximum embarrassment for Plaintiffs. The contents of Webster's email ranged from the disgusting to the absurd. On the disgusting side, Webster accused Stone of wanting to see him sexually assaulted in front of his children—a loathsome lie with no basis in fact, concocted wholly with the intention of slandering Stone. On the absurd side, Webster professed terror in response to the allegations that Stone had said that he wanted Webster to fall victim to an asteroid strike. Numerous other claims Webster made were wholly synthesized from thin air to inflict reputational harm on Stone Hilton and Stone and Hilton individually. Each allegation in Webster's lie was crafted to make Stone and Hilton appear unstable

and untrustworthy—false attributes obviously damaging to the professional reputations of two of Texas's highest-profile lawyers.

34.    Finally, Webster directed key allies to use public information requests to ask for the email to use as leverage against Stone Hilton. Webster had previously instructed, persuaded, coerced, or encouraged Jordan Eskew, a current employee of OAG and former legal assistant at Stone Hilton, to pursue meritless claims of sexual harassment against Plaintiffs with the Texas Workforce Commission. Webster then advised Eskew to specifically request the letter through Public Information Act requests. Webster did so despite knowing that there were numerous reasons that releasing such an email would violate the Public Information Act itself, ranging from protecting Stone and Hilton's private information to the interests OAG would have as an employer in keeping personnel notes confidential. Nonetheless, when the requests for the email arrived, Webster directly ordered that the email was to be released.

35.    Reno and Molina helped devise this plan, assisted in the composition of this email, followed up with other actions designed to legitimize the email—such as a later Reno email articulating false concerns about Webster's safety—and encouraged Webster's actions. It was, in every sense, a conscious blackmail scheme devised and executed by Webster, Molina, and Reno.

36.    Participation in Webster's scheme and lying about Stone, Hilton, and Stone Hilton was not within the job duties of Webster, Reno, or Molina, and far exceeded any of their official duties.

37.    Upon discovering the email, Stone and Hilton informed the Attorney General of the letter and its falsity and objected to its release under the Public Information Act in the first place. Consistent with his obligation to make public-information rulings in the face of such objections, and after consulting with numerous members of his senior staff, the Attorney General determined

that it should never have been released by OAG in the first place. On the recommendation of members of his staff who disagreed with Webster's actions, the Attorney General directed that OAG recall the email and rule that it was improperly released. Webster, realizing that Stone and Hilton had obtained the Attorney General's support in rescinding the email, decided to foil the Attorney General's efforts. Eskew abruptly cut off negotiations and filed her meritless litigation against Plaintiffs.

38.     As Webster anticipated, his hyperbolic claims regarding Stone and Hilton received substantial media attention, much of it incorrectly taking Webster's email as the product of an investigation. The email was *not* the product of an investigation—it was fabricated fifteen months after the impeachment trial, explicitly for the purpose of retaliating against Stone and Hilton for exercising their constitutional and statutory rights. Nonetheless, the resulting media attention caused Stone and Hilton significant embarrassment and a loss of standing in their professional and personal circles—just as Defendants intended.

39.     So that there can be no doubt: Webster's December 2, 2024 email is a lie. Stone and Hilton categorically deny any allegations of sexual harassment, and they deny that they ever admitted to any sexual harassment. Webster's false allegations are repulsive.

40.     The email is nothing more than retaliation against Plaintiffs for their refusal to play ball with a corrupt public official. Webster sent the email in response to Plaintiffs' efforts to obtain documents that would prove his corruption. Webster later orchestrated the release of the email in order to inflict maximum harm against Plaintiffs. Upon learning that the Attorney General denounced the email and the decision to release it, Webster undermined his boss's authority by ensuring that the email was made public. Aided and abetted by Reno and Molina, Webster then did

whatever he could to embarrass Stone and Hilton and tarnish their reputations as he desperately clings to power.

41.    Texans should be disappointed to know that the person leading the Office of the Attorney General cares so little for the responsibility attendant to his office that he and his enablers will stop at nothing to benefit themselves and harm Brent Webster's personal enemies.

## FIRST CAUSE OF ACTION

### Violation of First Amendment's Speech Clause

### (Against all Defendants)

### 42 U.S.C. § 1983

42.    To establish a First Amendment retaliation claim, all plaintiffs must establish is that "(1) they engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

43.    Plaintiffs' communications to the Attorney General, to OAG, and to those in their social and professional circles regarding Webster's corruption are unquestionably constitutionally protected conduct: if the First Amendment's Speech Clause guarantees anything, it protects the right of private citizens to identify and discuss misbehavior by public officials.

44.    Defendants are likewise unquestionably state actors: each holds a senior role at the Office of the Attorney General of Texas.

45.    Defendants' actions—from Webster's interference with Stone Hilton's business to their composition and planned release of the email designed to slander Plaintiffs—have inflicted reputational and economic injuries. Defendants engaged in a campaign of calculated retaliatory harassment, effectively preventing Plaintiffs from speaking against Webster thus forcing a reasonable person in Plaintiffs' shoes to desist. Defendants used official action against Plaintiffs in response to their speech and intimated a threat of further sanction by expressly referencing Stone and Hilton's PIA requests, causing a chilling effect on Defendants exercise of their First

Amendment Rights. A person of ordinary firmness would be deterred from speaking out against corruption if it would jeopardize significant business revenue as a consequence; likewise, he would be deterred if he knew that a highly placed state official would create a false record claiming that he had confessed to sexual harassment, or that he had a pedophilic fantasy, or any of the other scurrilous claims Webster included in his December 2024 email. *Id.* at ¶ 5. A person of reasonable firmness is not willing to press on in the face of substantial financial and reputational risks just to expose a public official's corruption. Stone and Hilton have been diminished in their ability to speak out about Webster to the Attorney General, to OAG, to prospective clients, and to those in their social and professional circles because of the lies about Stone and Hilton.

46.    Defendants' actions were substantially caused by Stone and Hilton's exercise of their First Amendment speech rights regarding Webster. Webster repeatedly attacked Stone Hilton's business because Stone and Hilton described Webster as corrupt to the Attorney General and to other private individuals at various social events. Webster understood the PIA request as an extension of Plaintiffs' First Amendment rights because the documents responsive to the requests would corroborate the statements Plaintiffs had made about Webster. And Webster, Molina, and Reno fabricated the email and distributed it to others for eventual use in the media because of Stone Hilton's public information request regarding Webster's corruption. Not only did eyewitnesses see Webster organize numerous meetings to retaliate against Stone Hilton in response to the request, the email—falsely describing events that took place fifteen months prior—was written mere days after the public information request. Indeed, the email states on its face that it was created in response to—that is, caused by—Stone's and Hilton's request for public documents.

47.    Molina and Reno cooperated with Webster because of their agreement with his actions, out of their own self-interest in protecting high-profile careers at OAG that depended

entirely on personal loyalty to Webster, and because of their desire to see Stone and Hilton's speech and claims stifled. They each took steps to ensure that the scheme was successful, including taking part in its planning and execution and sending follow-up communications to make the email appear more credible.

48.     The actions of Webster, Reno, and Molina adversely reflect on Stone's and Hilton's fitness to conduct their business or trade. The lies in the email are peculiarly harmful Plaintiff's trade, business, or profession, and do not merely reflect upon Plaintiffs' general characteristics, because they undermine both lawyers' stock in trade: sound judgment, credibility, respectability, competence, and adherence to the law. The lies of a graphic nature, paired with lies about both men's actions toward colleagues or subordinates, harmed Stone and Hilton by implying they were unsafe and could not be trusted. Necessarily, as the founders of Stone Hilton, the lies about Stone and Hilton would ordinarily tend to and did injure their law firm as well.

49.     Even if Plaintiffs could not prove actual damages—they can—they are entitled to recover nominal damages for retaliation against the exercise of First Amendment rights. *See Perry v. Sindermann*, 408 U.S. 593 (1972).

**SECOND CAUSE OF ACTION**

**Conspiracy to Violate the First Amendment's Speech Clause**

**(Against all Defendants)**

**42 U.S.C. § 1983**

50.     Defendants' actions each violated plaintiffs' First Amendment rights. But so did their illegal and ongoing conspiracy to do so: Webster, Molina, and Reno have formed, acted on, and continue to this day an unlawful agreement to use state power to harm Plaintiffs by impeding their ability to obtain cases and clients and by attempting to harm plaintiffs' reputations.

51.     A section 1983 conspiracy claim requires only "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Bevill v. Wheeler*, 103 F.4th 363, 374 (5th Cir. 2024).

52.     Defendants actively conspired to create, disseminate, and publish the retaliatory email that violated plaintiffs' First Amendment rights. Each understood from the outset and agreed that their collective goal was to harm Plaintiffs' reputations in retaliation for Stone and Hilton's advocacy against Webster's corruption. Each acted for their personal gain, and any actions that they took as OAG staff was for a personal purpose of their own. Each assisted in drafting and then responding to the email as a putative official document to make it appear authentic so as to maximally harm Plaintiffs when the document became public, as the conspiracy intended all along.

53.     Defendants actions were also outside the scope of their employment, their actions exceed the bounds of their authority, or they have engaged in unauthorized acts because Defendants had no power or authority to engage in acts of fraud, waste, or abuse to further their plans to harm Plaintiffs by violating their constitutional and statutory rights.

54.    Each of their actions furthered the conspiracy. Upon information and belief, Defendants collaboratively drafted the email through a series of meetings convened with the express purpose of retaliating against Plaintiffs. Each sent official communications through the OAG, while drafting the email and afterwards, in an effort to legitimate Webster's falsehoods. For example, Reno ultimately dispatched a security detail to Webster's private residence even though no reasonable person would have concluded based on Plaintiffs' actions that Webster was in any danger from Stone *and* despite Reno's own, subjective belief that Webster was in no danger.

55.    Without their coordinated efforts, the conspiracy to harm Plaintiffs would not have succeeded: each was necessary to engineer and legitimate the lies in Webster's otherwise facially ridiculous email and to eventually cause its release through the press to harm plaintiffs and their reputation. This conspiracy and its resulting harms deprived plaintiffs of their rights under the First Amendment's Speech Clause.

## **THIRD CAUSE OF ACTION**

**Violation of the First Amendment's Petition Clause**

**(Against all Defendants)**

**42 U.S.C. § 1983**

56.    The First Amendment's Petition Clause protects a related right: the right to direct political speech towards governmental actors or the government in general for assistance. Plaintiffs establish such a claim through the same three-part framework as for a violation of their Speech Clause rights: by identifying the exercise of a protected right, an injury by defendants that would deter an individual of reasonable firmness from exercising that right, and a "'causal connection' between the government defendant[s'] 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Batyukova v. Doege*, 994 F.3d 717, 730 (5th Cir. 2021).

57.    Plaintiffs' advocacy was an exercise of their Petition Clause rights: by reporting Webster's conduct to the OAG and the Attorney General himself, plaintiffs sought redress for their economic and reputational harm by putting an end to Webster's corruption that affected the State, their clients, and themselves. Likewise, Stone Hilton and its principals' request for public documents through a Public Information Act request is petitioning protected under the First Amendment: it was a request for information protected in law in service of a public matter that affected plaintiffs and all Texans. *Id.* at ¶ 27.

58.    The harms that would have deterred a reasonable person from exercising their speech rights—that is, substantial financial losses and public embarrassment through intensely scurrilous public claims, as described in Count One—would similarly deter a person of reasonable firmness from exercising his petitioning rights. Few if any will petition the government's assistance in the face of an overbearing, petty public employee if the consequence of asking for

that assistance (or reporting that employee's misconduct) is the targeting of professional contracts enjoyed by, and the professional reputation of, the petitioner. As with Count One, Stone and Hilton have been diminished in their ability to speak out about Webster to the Attorney General, to OAG, to prospective clients, and to those in their social and professional circles because of the lies about Stone and Hilton.

59.     As identified in Count One, the retaliatory plot hatched by Defendants was substantially caused by plaintiffs' petitioning to the Attorney General and OAG. The plot arose during meetings convened to respond to plaintiffs' PIA request; Webster's slanderous email issued mere days after the PIA request; the email itself acknowledges it was created in response to that request.

## FOURTH CAUSE OF ACTION

**Conspiracy to Violate the First Amendment's Petition Clause**

**(Against all Defendants)**

**42 U.S.C. § 1983**

60.    Once again, Defendants acted in concert to deprive Stone Hilton and its principals of their Petition Clause rights.

61.    Their actions were substantially the same as those outlined in the foregoing counts; the rights Stone Hilton exercised were substantially the same as those outlined in Count Three. In summary, Webster, Molina, and Reno came to an agreement—one upon which they act still today—to create, legitimate, and publish Webster's slanderous email with full knowledge of its provenance.

62.    Plaintiffs experienced a deprivation of their Petition Clause rights for substantially the same reasons as outlined in Count Three.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and the following relief:

  a.  Actual and economic damages in an amount to be proved at trial;

  b.  Punitive damages in an amount to be proved at trial;

  c.  Other exemplary damages as available under federal law;

  d.  An injunction against Defendants' further acts of retaliation against plaintiffs;

  e.  Plaintiff's costs and attorneys' fees to litigate this action as allowed under federal law;

  f.  Pre- and post-judgment interest as provided by law; and

  g.  For all such other and further relief allowed by law and equity as is just and proper.

      Respectfully submitted,

      */s/ J. Stephen Toland*_____
      J. Stephen Toland
      State Bar No. 24029863
      stephen@tolandlegal.com

      TOLAND LAW FIRM, PLLC
      1305 San Antonio Street
      Austin, TX 78701
      Tele: (512) 621-9545
      Facsimile: (512) 612-9613
      **ATTORNEY FOR PLAINTIFFS**

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2025, a true and correct copy of the foregoing document was served via the Court's electronic filing system to all counsel of record.

*/s/ J. Stephen Toland*
J. Stephen Toland