June 24, 2025

Seana Willing  *Via Email: swilling@texasbar.com*
Chief Disciplinary Counsel, State Bar of Texas  *& First-Class Mail*
1414 Colorado Street, Suite 200
Austin, Texas 78701

RE:   TDRPC 8.03(a) Report re Brent Edward Webster

Dear Ms. Willing:

Pursuant to Rule 8.03(a) of the Texas Disciplinary Rules of Professional Conduct ("**TDRPC**"), Judd Stone II ("**Stone**") and Christopher Hilton ("**Hilton**") respectfully report the egregious professional misconduct of Brent Edward Webster ("**Webster**"), First Assistant Attorney General in the Office of the Attorney General of the State of Texas ("**OAG**").

TDRPC 8.03(a) imposes an affirmative duty on lawyers to report misconduct when the lawyer has knowledge that another lawyer "has committed a violation of applicable rules of professional conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." The TDRPC primarily serves to protect the public and maintain the integrity and reliability of the legal profession by establishing minimum standards of conduct. It is when lawyers—especially those in influential positions in the State government—violate these rules that the threat to the public is at its greatest.

*A. Interference with Representation*

In May 2023, the Texas House of Representatives approved articles of impeachment against Attorney General Ken Paxton ("**Paxton**"). With Paxton set to face trial in the Texas Senate, Stone, then-Solicitor General, and Hilton, then-Chief of the General Litigation Division, took a leave of absence to form the law firm Stone Hilton PLLC ("**Firm**") with the intended purpose to represent Paxton during his impeachment trial.

Though the Firm had an attorney-client relationship with Paxton, Webster and his allies at the OAG tried to meddle in the Firm's representation of Paxton. Specifically, shortly after Stone and Hilton's exit from the OAG, Webster and his co-conspirators showed up to the Firm and demanded that Stone and Hilton disclose confidential information they had amassed during the impeachment proceedings, in violation of **TDRPC 1.05(b)(1)(ii), 1.05(b)(4), 8.04(a)(1), and 8.04(a)(3)**. When Stone and Hilton refused to violate attorney-client privilege and their obligation to preserve confidentiality, Webster threatened to retaliate against Stone, Hilton, and the Firm.

Webster also attempted to tamper with potential witnesses for the impeachment proceedings. Webster repeatedly suggested to Stone and Hilton—in no uncertain terms—that Webster would pressure potential witnesses to flee the State to evade being subpoenaed to disclose information harmful to Webster, in violation of **TDRPC 3.03(a)(2), 3.04(a), 3.05(a), 4.01(b), 8.04(a)(1), 8.04(a)(3), 8.04(a)(4), and 8.04(a)(12)**. Additionally, during official hours which should have been devoted to fulfilling his official duties as First Assistant Attorney General,

Page 1 of 4

Webster attempted to taint the testimony of potential witnesses by spinning facts in Webster's favor. During these conversations, Webster, acting alone, suggested that individuals who did not give testimony favorable to Paxton's impeachment defense could expect to be terminated from the OAG, in violation of **TDRPC 1.13(b), 3.03(a)(2), 3.04(b), 3.05(a), 8.04(a)(1), 8.04(a)(3), 8.04(a)(4), and 8.04(a)(12)**. Furthermore, Webster stated on several occasions that he was Stone and Hilton's boss and instructed witnesses not to speak with Stone or Hilton without Webster present or without his approval, in violation of **TDRPC 3.04(a), 4.01(a), 8.04(a)(1), 8.04(a)(3), 8.04(a)(4), and 8.04(a)(12)**.

Stone and Hilton repeatedly admonished Webster that they did not work for him during the pendency of the impeachment; that their sole loyalty was to their client, Paxton; that Webster's likely role as a fact witness meant that he should isolate himself from any impeachment-related matters; and that Webster appeared to be obstructing justice, committing official oppression, and tampering with witnesses. Unsurprisingly, Webster ignored these warnings.

### B. Further Retaliation

Webster has set his sights on destroying Stone, Hilton, and the Firm. In November 2024, the Firm reached a verbal agreement to represent a client—a contract that would have secured substantial revenue for the Firm. When Webster heard of this, he used his office to pressure the client to rescind the agreement with the Firm—in violation of **TDRPC 4.02(a), 8.04(a)(1), 8.04(a)(3), and 8.04(a)(12)**—which the client ultimately did.

Determined to obtain substantive proof of Webster's corruption, Stone and Hilton submitted a detailed request under the Public Information Act ("**PIA**") on November 27, 2024. After being notified of the PIA request, Webster swiftly began strategizing with other executive OAG officials on how to further retaliate against Stone and Hilton. On information and belief, Webster decided that the most effective course of action would be to proceed in three steps.

First, Webster created an official document—an email memorandum—that fabricated wrongdoing by Stone and Hilton from fifteen months earlier to retroactively change the reason for Stone and Hilton's departure from resignation to termination because of allegations of sexual harassment, in violation of **TDRPC 1.13(a), 1.13(b), 4.01(a), 8.04(a)(1), 8.04(a)(3), and 8.04(a)(12)**. Webster drafted the memorandum through a pretextual appeal to his personal safety despite neither having proof of any physical threat to his safety nor having spoken to Stone or Hilton for several months. Webster's safety concerns were and are a lie—one that purportedly "justifies" his use of a security detail on the dime of hard-working Texas taxpayers.

Second, Webster included in the memorandum many salacious allegations to ensure maximum media coverage and, therefore, maximum embarrassment for Stone, Hilton, and the Firm. Webster's memorandum stated on its face that it had been composed in response to—*i.e.,* in retaliation for—Stone and Hilton's PIA request. Specifically, Webster claimed in his memorandum that Stone wanted to see Webster sexually assaulted in front of his children and desired that Webster would fall victim to an asteroid strike. Webster knowingly made the false allegations to harm to Stone, Hilton, and the Firm's reputation, in violation of **TDRPC 1.13(a), 1.13(b), 4.01(a), 8.04(a)(1), 8.04(a)(3), and 8.04(a)(12)**.

Finally, Webster conspired with key allies, directing them to obtain Webster's memorandum by submitting PIA requests. Specifically, on information and belief, Webster instructed Eskew, a close ally and friend of Webster, and her attorney, Emily Frost ("**Frost**") to specifically request Webster's memorandum. Webster did so despite knowing that releasing the memorandum would violate the PIA by disclosing private information of Stone and Hilton and by interfering with the OAG's interests as an employer to keep personnel notes confidential, in violation of **TDRPC 1.05(b)(1)(ii), 1.05(b)(4), 1.13(a), 8.04(a)(1), 8.04(a)(3), and 8.04(a)(12)**. Nonetheless, when the PIA requests arrived at Webster's desk, he ordered the head of OAG's Open Records Division to release the memorandum immediately.

Once Eskew and Frost obtained Webster's memorandum, Webster directed Eskew to include it in her complaint with the Texas Workforce Commission Civil Rights Division against the Firm for the unsubstantiated allegation of sexual harassment, all in violation of **TDRPC 4.01(b), 8.04(a)(1), 8.04(a)(3), and 8.04(a)(12)**. Webster did so because he was angered at Stone and Hilton's unwillingness to condone Webster's illegal conduct and abuse. Despite denying the allegations of sexual harassment, the Firm agreed to negotiate with Eskew. Over the following months, Webster encouraged Eskew and Frost to demand increasingly large sums of money from Stone and Hilton to settle Eskew's meritless claims. While Eskew initially demanded an amount five times the statutory damages cap, Eskew increased her demands as time passed—all at Webster's insistence.

Meanwhile, Stone and Hilton eventually discovered Webster's memorandum within the documents they received under their PIA request. Stone and Hilton informed Paxton of the falsity of the allegations contained in Webster's memorandum and objected to its release under the PIA. Consistent with his authority under the PIA, Paxton determined that Webster's memorandum was false and should never have been released in the first place. Paxton then directed the OAG Open Records Division to recall the memorandum and rule that it was improperly released.

On information and belief, Webster, realizing that Stone and Hilton had obtained Paxton's support in recalling the memorandum, decided to foil Paxton's efforts by directing Eskew and Frost to quickly file a federal lawsuit against Stone, Hilton, and the Firm and attach the memorandum to the complaint to forever cement it in the public eye, in violation of **TDRPC 1.05(b)(1)(ii), 1.05(b)(4), 1.13(a), 1.13(b), 3.05(a), 4.01(a), 8.04(a)(1), 8.04(a)(3), and 8.04(a)(12)**. Webster did so despite large portions of the memorandum having no evidentiary relation to any of Eskew's claims. As Webster anticipated and manufactured, his hyperbolic claims regarding Stone and Hilton received substantial media attention, much of which spread misinformation regarding the legitimacy of the "investigation."

## C. Webster's Corruption and Abuse of Office

Webster has a pervasive history of breaking Texas laws, violating the public trust, and misusing the authority of his office to benefit himself at the expense of the profession and hard-working Texans. Stone and Hilton have each personally seen evidence of numerous crimes and misdeeds Webster has committed during his disastrous tenure with the OAG.

Webster abuses his power at the OAG by using his official position and his interactions with private citizens, lawyers, and law firms to try to obtain future lucrative employment and harm

his enemies for no other reason than Webster's personal vendetta, in violation of **TDRPC 1.13(a), 8.04(a)(1), 8.04(a)(3), and 8.04(a)(12)**. Hilton personally received this treatment from Webster in the earliest days of Paxton's prospective impeachment, including when Webster made it known that Hilton "better get in line" and that Hilton's career at the OAG depended on whether Hilton acted in concert with Webster's wishes, in violation of **TDRPC 8.04(a)(1), 8.04(a)(3), and 8.04(a)(12)**.

Additionally, Webster continues to misappropriate State funds. Specifically, Webster conscripts security officers and the OAG motor pool into service as his private drivers and uses OAG funds for unnecessary travel to lobby for a federal position in the Trump Administration—all to line his own pockets—in violation of **TDRPC 1.13(a), 8.04(a)(1), 8.04(a)(3), and 8.04(a)(12)**. Moreover, Webster, as a matter of course, has granted himself the largest raise allowable under Texas law each year; as of September 2025, Webster will earn over $361,000—an almost 30% raise over his current salary, and more than 400% of what many OAG attorneys earn. Also, Webster repeatedly asked Stone how he (Webster) could use Texas taxpayer dollars to fund his (Webster's) personal legal fees for his ongoing federal criminal investigation, in violation of **TDRPC 1.13(a), 8.04(a)(1), 8.04(a)(3), and 8.04(a)(12).**

Webster has engaged in criminal conduct, interfered with the attorney-client relationship, conspired with others to file frivolous lawsuits, attempted to tamper with witness and obstruct justice, corrupted the legitimacy of the OAG, and has abused his office—all for his personal gain and at the expense of his fellow Texans. Because Stone and Hilton believe Webster's conduct has violated at least the TDRPC outlined in this report, cumulatively we believe this does raise a substantial question as to Webster's honesty, trustworthiness, and fitness as a lawyer, Stone and Hilton submit this report pursuant to their professional obligations under TDRPC 8.03(a).

Respectfully submitted,

/s/ Judd E. Stone II
Judd E. Stone II
State Bar No. 24076720


/s/ Christopher D. Hilton
Christopher Hilton
State Bar No. 24087727