## UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

**STONE HILTON PLLC, a Texas**
**Professional Limited Liability Company;**
**JUDD STONE; and CHRIS HILTON**,
              Plaintiffs,

      v.

**BRENT WEBSTER, in his individual**
**capacity; RALPH MOLINA, in his**
**Individual capacity; and JOSH RENO,**
**in his individual capacity**,
              Defendants.

Case No. 1:25-CV-000983

## PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION
## TO MOTION TO DISMISS OF DEFENDANTS
## BRENT WEBSTER, RALPH MOLINA, AND JOSH RENO

J. Stephen Toland
State Bar No. 24029863
stephen@tolandlegal.com
TOLAND LAW FIRM, PLLC
1305 San Antonio Street
Austin, TX 78701
Tele: (512) 621-9545
Facsimile: (512) 612-9613
ATTORNEY FOR PLAINTIFFS

## TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 2

Legal Standard .................................................................................................................. 8

Argument and Authorities ............................................................................................... 8

I.      Plaintiffs State a Claim for Retaliating in Violation of Their First Amendment Speech
        Rights. .................................................................................................................... 9

II.     Plaintiffs Properly Pleaded a Violation of the First Amendment's Petition Clause. ......... 13

III.    The Well-Pleaded Violation of Plaintiffs' Clearly Established Rights Defeats Any Claim
        of Qualified Immunity. ......................................................................................... 15

        A.    The law is clearly established in Plaintiffs' favor. .................................... 17

        B.    Plaintiffs have sufficiently alleged a violation of their rights that overcomes qualified
              immunity at this stage. ..................................................................................... 20

        C.    Plaintiffs have also alleged that Defendants' actions were objectively unreasonable
              and outside the scope of any discretionary authority—facts equally fatal to qualified
              immunity. ........................................................................................................... 26

IV.     Each First Amendment and Conspiracy Claim in the Amended Complaint Satisfies the
        Minimal Pleading Standards. ............................................................................... 28

        A.    The allegations against Molina and Reno show conscious cooperation and
              participation with Webster to harm Plaintiffs. ........................................ 28

        B.    The Complaint sufficiently alleges plausible conspiracy allegations. .......... 29

        C.    Defendants caused Plaintiffs' injury. ............................................................. 31

V.      Dismissal for Want of Jurisdiction Is Improper Because Plaintiffs Have Standing. ......... 32

Conclusion and Prayer ................................................................................................... 35

Certificate of Service ...................................................................................................... 36

## INTRODUCTION

Three of the seniormost officials overseeing the Texas Attorney General's Office suggest they are at liberty to concoct a sham security threat, use their office to fabricate post-dated supporting evidence, and disseminate that material in violation of state law—all in an express attempt to retaliate against former employees who dared to speak out against the crimes and misdeeds of First Assistant Attorney General Brent Webster. Defendants conspired to do so knowing that releasing information falsely portraying Plaintiffs' departure from the Attorney General's Office as the result of a sexual-harassment investigation would harm Plaintiffs, their reputations, and—by extension—their business. Each Defendant played a crucial role in this conspiracy. And Plaintiffs have alleged, in part based on their knowledge as former insiders working for Webster, that such agreements are always extensively planned and discussed before being formalized in writings like the salacious, false email at the heart of this case. Defendants' actions violated Plaintiffs' rights.

Plaintiffs adequately pleaded constitutional violations and a conspiracy. That suffices under the Federal Rules of Civil Procedure. Defendants contend that they are entitled to dismissal because the First Amendment extends neither to Plaintiffs' speech nor to their attempts to seek information under Texas's public-information laws; because the lack of clearly established law entitles them to qualified immunity; and because the alleged harm—damage to Plaintiffs' business —constitutes neither redressable harm nor a basis for this Court's subject-matter jurisdiction. But Plaintiffs have plausibly alleged that Defendants conspired to fabricate knowingly false and damaging evidence and release it for the sole purpose of publishing salacious allegations to damage Plaintiffs' reputations and credibility. Finally, Defendants raise numerous factual disputes in an attempt to defend their own misconduct. But because Defendants' factual disputes are inappropriate at this stage, the motion to dismiss must be denied.

## BACKGROUND

Defendants purport to state the background of the case, ECF No. 17 at 9-15, yet in reality, they largely use citations to the Amended Complaint to inject their own self-serving narrative. Defendants object to it as such. The facts underlying this dispute are fully described in Plaintiffs' Amended Complaint, ECF No. 11, but a fair summary of the Amended Complaint follows here.

As First Assistant Attorney General, Defendant Brent Webster is effectively in charge of the Office of the Attorney General ("OAG") on a day-to-day basis. ECF No. 11 ¶ 1. He misuses the position of that office to enrich and serve his own personal interests, relying on support for his misdeeds by rewarding individuals who comply and punishing those who resist. *Id.* ¶¶ 1-2. Webster, a former Williamson County prosecutor, took power at OAG in October 2020 after the departure of former First Assistant Attorney General Jeff Mateer and other former OAG executives who had accused Texas Attorney General Ken Paxton of wrongdoing in office. *Id.* ¶ 15. Because of Webster's prosecutorial background, he exerts practical control over law-enforcement decisions at the agency, relying on subordinates' compliance to enforce Webster's agenda for personal benefit. *Id.* ¶ 17.

Plaintiffs Judd Stone and Chris Hilton formerly worked under Webster at OAG until they left the agency to defend Attorney General Ken Paxton in his impeachment trial. *Id.* ¶ 3. During their tenure at OAG prior to Attorney General Paxton's impeachment, both Stone and Hilton were regularly called upon by Webster to advise General Paxton and other key staff on virtually all of OAG's most sensitive matters. *Id.* While at OAG, Judd Stone served as Solicitor General and Chris Hilton served as Chief of the General Litigation Division. As Solicitor General, Stone was responsible for overseeing the State of Texas's appeals, including handling matters before the U.S. Supreme Court. *Id.* ¶ 19. As Chief of General Litigation, Hilton was responsible for overseeing a division of as many as 70 employees who were handling hundreds if not thousands of cases. *Id.*

They often worked in close quarters with General Paxton, Webster, and other critical agency personnel, with no expression of concern for the safety of anyone involved. *Id.* ¶ 3. Stone and Hilton have since moved on to their law firm, Stone Hilton PLLC. *Id.* But because of personal and political disagreements with Webster, who views expressions of disagreement as evidence of disloyalty that must be eradicated, Stone and Hilton have been subjected to Webster's retaliation. *Id.*

Most recently, Webster abused his office by conspiring with his top lieutenants, Defendants Ralph Molina and Josh Reno, to harm Plaintiffs and their business. *Id.* ¶¶ 4, 16-18. Reno is a longtime Webster confidant and former prosecutor, but in practice served as Webster's loyal, compliant enforcer. *Id.* ¶¶ 16-17. Molina, who currently serves as Deputy First Assistant Attorney General, was elevated from his position as a junior OAG line lawyer by Webster as a reward for Molina's unquestioning loyalty to him. *Id.* ¶ 18. Defendants worked in concert to draft a false and defamatory email that alleges Stone and Hilton engaged in and admitted to sexual harassment. *Id.* ¶ 4 (citing Ex. B, ECF No. 11-2,). That email is a lie and Plaintiffs categorically deny it. *Id.* ¶¶ 4, 39. But the circumstances surrounding it inform the First Amendment and conspiracy claims at issue here.

During the course of the Paxton impeachment, Stone and Hilton observed and believed that Webster committed state and federal crimes throughout the impeachment process; that Webster's response to being confronted with these concerns—including lying and retaliation—made it impossible for the three to work together at OAG; and that Webster would stop at nothing to protect his own position of power by harming Stone and Hilton, whom he began to perceive at threats because of their speech. *Id.* ¶ 20. Stone and Hilton departed OAG and have been principals of Stone Hilton PLLC ever since, focusing on growing their law firm. *Id.* ¶¶ 20-21. But law firms that

Webster perceives as disobedient or disloyal are "blacklisted" from representing the State. *Id.* ¶ 21. Harming Stone Hilton would preserve opportunities for competitors of the firm that Webster perceived as potential landing spots after his tenure as First Assistant ended. *Id.* To that end, Webster has retaliated against Stone and Hilton for speaking out against him, harming Stone and Hilton's business by impeding the ability of Plaintiffs' firm to compete for business, reducing its market share, and devaluing the marketability of Stone's and Hilton's experience. *Id.* ¶ 22.

Stone and Hilton initially took Webster's actions in stride, but Webster had no intention of letting go of the petty, personal grudge he harbored against Stone and Hilton for daring to speak out against Webster's wrongdoing. *Id.* ¶ 23. In November 2024, Webster escalated his attacks. After learning that Stone Hilton had reached an agreement in principle with a prospective client for a potentially six-figure engagement, Webster used his official authority within OAG to communicate to the client that they should not hire Stone Hilton. *Id.* ¶ 24. Faced with the risk of dire consequences for defying a direct request from the First Assistant Attorney General, the client complied. *Id.*

To that end, Stone and Hilton agreed that the best course of action would be to exercise their right to request documents from OAG that tended to substantiate what they had seen first-hand: that Webster used OAG to enrich himself and pursue his self-serving vendettas and interests at the State's expense. *Id.* ¶ 26. Stone and Hilton drafted and submitted an appropriate request under the Public Information Act on November 27, 2024, and expected they would use the documents they received as part of a case to the Attorney General—and, if needed, the public— regarding Webster's corruption. *Id.* (citing Ex. A, ECF No. 11-1). On receipt of the request, Webster was apoplectic; Webster held over a dozen meetings with various members of the executive staff— especially Ralph Molina and Josh Reno—as to how to harm Plaintiffs to the

4

greatest extent possible. *Id.* ¶ 27. Their avowed, mutual goal was to harm the firm and its principals because they had sought information made accessible to the public by statute that would have tended to show Webster's corruption and overtly discussed "retaliation" in exactly that language. *Id.*

To do so, Webster fabricated an email in December 2024—a false official document that lied about wrongdoing by Stone and Hilton. *Id.* ¶ 28. Despite the fact that they had departed OAG fifteen months earlier, he wrote this email to retroactively change the reason for their separation from OAG to termination because of allegations of sexual harassment. *Id.*

Webster's fabrication could not have come to life without Molina and Reno. *Id.* ¶ 4. In the email, Webster made a completely pretextual appeal to his physical safety, falsely alleging danger from Stone, despite the two not having exchanged words directly in over a year and despite the utter absence of any physical threat from one to the other. *Id.* ¶ 29. Put bluntly, Webster's safety concerns were a lie. *Id.* Webster's email stated on its face that it had been composed in response to Stone Hilton's public information request. *Id.* The longstanding history of working in close personal proximity to Webster, Reno, and Molina for years undercut any notion that Stone posed any physical threat to Webster. *Id.* ¶ 30. To get around this obvious flaw in Webster's malicious hitjob, Webster concocted a number of salacious allegations, including that Webster harbored a new fear that Stone allegedly wished him to suffer an "asteroid" strike. *Id.* Upon information and belief, Webster, Reno, and Molina understand how asteroids work and understand that Stone cannot summon them to strike his foes. *Id.*

Reno and Molina perpetuated the scheme by helping Webster tie his lie about security concerns to the OAG employment of Stone and Hilton and their work on the Paxton Impeachment. *Id.* ¶ 31. Webster implicated Reno as purportedly having recollection of allegations against Stone

and Hilton concerning their OAG employment and regarding previous security measures OAG took for Stone's own safety. *Id.* Similarly, Webster implicated Molina as having witnessed allegations about Stone made by an OAG employee returning to the agency after the impeachment. *Id.* It is Webster's practice for such a writing to memorialize an agreement in principle already discussed among the recipients of such a document. *Id.*

Each Defendant thus knowingly participated in the unlawful scheme. In view of Reno's law-enforcement experience and long history of working with Stone and Hilton, Reno knew or should have known that there was no actual security threat from Stone or Hilton to assess, and thus performed no genuine threat assessment. *Id.* ¶ 32. Upon information and belief, Reno instead authorized a security detail for Webster to give cover to Webster's lie about safety concerns. *Id.* Webster, Molina, and Reno all knew or should have known that fraud, waste, and abuse of taxpayer resources would violate OAG policy or Texas law. Yet they each disregarded their duties in service of their shared purposes to harm Plaintiffs because they each viewed Stone and Hilton's speech as a threat to their own careers and job security. *Id.* Their self-interested decision to participate in Webster's lie by helping concoct it, bolstering it, and amplifying it had no legitimate purpose. *Id.* ¶ 4. It served only to further the shared scheme of Webster and his coconspirators to advance their interests at Plaintiffs' expense.

In the defamatory email, Webster went on to make a number of other false allegations that would normally be too ridiculous to warrant a response. *Id.* Each allegation in Webster's lie was crafted to make Stone and Hilton appear unstable and untrustworthy—false attributes obviously damaging to the professional reputations of two of Texas's highest-profile lawyers. *Id.* ¶ 33. Webster further directed key allies to use public information requests to ask for the email to use as leverage against Stone Hilton. *Id.* ¶ 34. Webster had previously instructed, persuaded, coerced, or

6

encouraged Jordan Eskew, a current employee of OAG and former office manager at Stone Hilton, to pursue meritless claims of sexual harassment against Plaintiffs with the Texas Workforce Commission. *Id.* Notwithstanding numerous requirements to keep the email confidential, Webster directly ordered it to be released. *Id.* Webster subsequently countermanded Attorney General Paxton's efforts to maintain the email's proper confidentiality. *Id.* ¶ 37.

Because Webster abused the power of his office to spread his lies and falsely represented his slander as an official OAG investigation, Webster, Molina, and Reno achieved their true purpose: to punish Stone and Hilton because of Webster's personal vendetta against those who dare speak against him. *Id.* ¶ 4. Reno and Molina helped devise this plan, assisted in the composition of this email, followed up with other actions designed to legitimize the email—such as a later Reno email articulating false concerns about Webster's safety—and encouraged Webster's actions. *Id.* ¶ 35. It was a conscious blackmail scheme devised and executed by Webster, Molina, and Reno—outside the job duties of Webster, Reno, or Molina, and far exceeding any of their official duties. *Id.* ¶¶ 35-36. As Webster anticipated, his hyperbolic claims regarding Stone and Hilton received substantial media attention, much of it incorrectly taking Webster's email as the product of an investigation. *Id.* ¶ 38. The email was not the product of an investigation—it was a lie fabricated fifteen months after the impeachment trial, explicitly for the purpose of retaliating against Stone and Hilton for exercising their constitutional and statutory rights. *Id.*

Plaintiffs filed this case to expose Brent Webster and his crimes, to demand repayment for the economic and noneconomic harms that Webster, Molina, and Reno have inflicted on the firm and its principals, and to insist that Webster and his co-conspirators be punished to the fullest extent that federal law, Texas law, and a jury will allow. *Id.* ¶ 5. Defendants have moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted and under the

doctrine of sovereign immunity, as well as Rule 12(b)(1) for lack of standing. ECF No. 17.

## LEGAL STANDARD

Plaintiffs' "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), need only allege "enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The requirement for facial plausibility is met when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The pleading standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," but does not require detailed factual allegations. *Hurd v. Barnette*, 2017 WL 9289643, at *11 (E.D. Tex. Jan. 24, 2017), *adopted*, 2017 WL 892118 (E.D. Tex. Mar. 6, 2017) (citing *Iqbal*, 556 U.S. at 677-78). Because a Rule 12(b)(6) motion "tests the sufficiency of the pleadings, not the merits of the case," well-pleaded factual allegations of a complaint must be taken as true and viewed in the light most favorable to the plaintiff. *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022). The court draws all reasonable inferences for plaintiffs. *Doe v. Ferguson*, 128 F.4th 727, 733 (5th Cir. 2025).

The Court "applies a two-step analysis to determine whether a government official is entitled to qualified immunity, inquiring: (1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Guerra v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023) (quoting *Jennings v. Patton*, 644 F.3d 297, 300 (5th Cir. 2011)); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

## ARGUMENT AND AUTHORITIES

Plaintiff has plausibly alleged that Defendants violated Plaintiffs' First Amendment speech rights, engaged in an unlawful conspiracy as to Plaintiffs' speech rights, violated Plaintiffs' First Amendment Petition Clause rights, and unlawfully conspired to violate those rights as well.

Defendants knowingly fabricated a smear campaign in response to Plaintiffs' attempts to speak out against Webster's abuse of the office of First Assistant Attorney General and prosecute claims related to Brent Webster's malfeasance. Plaintiffs have detailed, based on firsthand knowledge from working closely with Defendants and information from those close to Webster, Molina, and Reno, how Defendants orchestrated this scheme to harm Plaintiffs and their law firm.

Defendants' arguments fall into five categories. Under Federal Rule of Civil Procedure 12(b)(6), they first argue that Plaintiffs fail to allege a violation of the First Amendment's Speech Clause. Second, they argue that Plaintiffs fail to allege a violation of the First Amendment's Petition Clause. Third, they argue that Defendants are entitled to qualified immunity. Fourth, they argue that the allegations supporting the First Amendment and conspiracy claims fail. Fifth, Defendants argue that Plaintiffs' claims fail for lack of standing and should be dismissed under Rule 12(b)(1). Each argument fails.

## I.    Plaintiffs State a Claim for Retaliating in Violation of Their First Amendment Speech Rights.

The Plaintiffs have alleged a claim for retaliation in violation of their First Amendment speech rights. The First Amendment "prohibits not only direct limitations on speech but also adverse government action against an individual because of [his] exercise of First Amendment freedoms." *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). To establish a prima facie claim, a plaintiff must allege (1) he was engaged in constitutionally protected activity, (2) the defendants' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

At the pleading stage, courts do not decide "which inferences are more plausible than other

competing inferences, since those questions are properly left to the factfinder." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013); *accord Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009). Defendants' competing inferences cannot require rejection of alternative explanations at this stage, as the Court may not "determine whether [P]laintiff's inference is equally or more plausible than other competing inferences." *See Lormand*, 565 F.3d at 267. The Court "accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Ferguson*, 128 F.4th at 733. Factual assertions are tested later.

Defendants ignore all this and instead attempt to recast the Amended Complaint. That is no basis for dismissal at the pleading stage. As an initial matter, Defendants incorrectly suggest that the Fifth Circuit has foreclosed Plaintiffs' claims. *Contra* ECF No. 17 at 21 (citing *Colson*, 174 F.3d at 512; *Matherne v. Larpenter*, 216 F.3d 1079 (5th Cir. 2000) (table)). The case law supports no such result. For instance, Defendants' own authority makes clear that the "First Amendment prohibits adverse government action against an individual because of the exercise of [his] First Amendment freedoms." *Matherne*, 216 F.3d at *3 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Colson*, 174 F.3d at 508)). It is only when a complaint entirely fails to allege "some more tangible adverse action" that bare allegations of retaliatory chill may not suffice. *Id.* (quoting *Colson*, 174 F.3d at 513). Because Defendants merely dispute the factual extent of their chill on Plaintiffs' speech, dismissal is unwarranted.

Defendants contend that the "making of false accusations" and "defamation or criticism followed by nothing more" cannot support a First Amendment retaliation claim. But Plaintiffs have not alleged a "retaliatory investigation claim" that would be limited by *Colson*. *See Villarreal v. City of Laredo*, 44 F.4th 363, 374 (5th Cir.), *reh'g en banc granted, opinion vacated*, 52 F.4th 265 (5th Cir. 2022), *and superseded on reh'g en banc*, 94 F.4th 374 (5th Cir. 2024), *cert. granted,*

*judgment vacated sub nom. Villarreal v. Alaniz*, 145 S. Ct. 368 (2024). Rather, the Complaint alleges that Defendants knowingly and intentionally—fifteen months after the fact—fabricated a government record to create the false appearance of an investigation, lied about it, and disseminated that lie in a calculated attempt to harm Plaintiffs and their law firm. While Defendants may prefer to re-characterize their unlawful conduct as "their own exercise of free speech," ECF No. 17 at 21, Rule 12(b)(6) precludes dismissal on that basis because the Court must favor Plaintiffs and infer the contrary at this stage.

Defendants further misunderstand the Complaint in disputing whether "Defendants' speech 'intimate[d] that punishment, sanction, or adverse regulatory action w[ould] imminently follow." ECF No. 17 at 21 (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 689 (4th Cir. 2000)). That self-serving spin on the allegations is improper as a basis for dismissal. At a minimum, the Plaintiffs have alleged that the creation and publication of the email *exceeded* a bare threat. Because all inferences must be drawn in Plaintiffs' favor, it is immaterial at the 12(b)(6) stage whether Defendants "stand by the veracity of the information contained in the December 2024 email." ECF No. 17 at 21. And Defendants are wrong that "the Complaint alleges, at most, defamation which is not actionable." *Id.* at 21-22 (cleaned up). Viewed in the light most favorable to Plaintiffs, the Complaint plausibly alleges that Defendants exceeded the bounds of mere speech by creating a false government record and then leaking it in violation of Texas public-information law.

Defendants are likewise wrong that Plaintiffs fail to allege that their speech has been chilled. *Contra id.* at 22-24. As above, Defendants merely ask this Court to accept Defendants' contrary narrative and view the allegations in the light least favorable to Plaintiffs. This Court cannot do. Plaintiffs plainly allege that their "exercise of free speech has been curtailed." *Keenan*,

290 F.3d at 259. Defendants concede, ECF No. 17 at 22, that the Amended Complaint alleges Plaintiffs "have been diminished in their ability to speak out about Webster," ECF No. 11 ¶ 45. Insofar as Defendants cite the fact that Plaintiffs complained about Webster to the State Bar and the appropriate authorities, *id.* ¶ 20, Plaintiffs never dispute the allegation that Plaintiffs were "curtailed" in their attempts to speak out against Webster's corruption by seeking evidence to support its existence through public-information channels. Thus, Plaintiffs have alleged that their speech has been diminished. *Contra* ECF No. 17 at 24.

Furthermore, the causal link between protected activity and adverse action are properly alleged. *Contra id.* at 24-26. Plaintiffs have alleged direct evidence tending to "establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury[.]'" *Id.* at 24 (quoting *NRA of Am. v. Vullo*, 602 U.S. 175, 203 (2024) (citing *Nieves v. Bartlett*, 587 U. S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 259 (2006)). Plaintiffs allege that Defendants met on several occasions for the specific purpose of harming Plaintiffs and used the phrase "retaliation" in those exact words. ECF No. 11 ¶ 27. The Complaint further alleges, based on personal knowledge from working with Webster, that Webster's enmity was based on speech that posed a threat to his personal interests, and that Molina and Reno shared similar views for purely self-interested reasons. *Id.* ¶¶ 3-4, 19-36. Defendants argue that Webster "acted on a 'personal vendetta' against Plaintiffs, not because of their exercise of any rights under the First Amendment," ECF No. 17 at 25, but they simply ignore the allegations based on personal experience that the two go hand-in-glove when it comes to Brent Webster and his cronies. Defendants are not free to refute those allegations at the pleading stage. Moreover, Defendants ignore that Webster is a high-ranking official who is not permitted by the Constitution to use his office to advance his personal vendettas against speech and speakers whom he dislikes.

## II.    Plaintiffs Properly Pleaded a Violation of the First Amendment's Petition Clause.

Defendants are likewise wrong that the Complaint fails to state a claim for a Petition Clause violation. Defendants contend that Plaintiffs "have not alleged facts establishing that they petitioned the government." *Contra* ECF No. 17 at 25. But Defendants concede that Plaintiffs allege that they spoke out by "reporting Webster's [alleged] conduct to the OAG and the Attorney General" and that Plaintiffs submitted a request to OAG under Texas's public-information laws to provide evidence for their claims. ECF No. 11 ¶ 57. Defendants do not dispute, and thus concede, that Plaintiffs were legally entitled to seek information supporting their complaints about Webster. *See* ECF No. 17 at 26 (citing Tex. Gov't Code § 552.021). Plaintiffs have also alleged (*e.g.*, ECF No. 11 ¶ 56) that Defendants subsequently impeded Plaintiffs by inflicting economic and reputational injuries that would deter an individual of reasonable firmness from exercising that right, and a "'causal connection' between the government defendant[s'] 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Batyukova v. Doege*, 994 F.3d 717, 730 (5th Cir. 2021). These allegations suffice at this stage to claim a violation of Plaintiffs' "expression directed to the government seeking redress of a grievance." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011).

Defendants insist that the Claim fails because Plaintiffs were required to allege more. Not so. Defendants concede that Plaintiffs alleged they "'sought an end to corruption' by reporting Webster's alleged misconduct." ECF No. 17 at 26 (quoting ECF No. 11 ¶ 57). In context, the Amended Complaint alleges that Plaintiffs confronted Webster, supporting the inference that they viewed Webster's corruption as incompatible with his continued tenure as First Assistant Attorney General. No. 11 ¶ 20. That refutes Defendants' contrary inference that Plaintiffs "never allege that they requested any form of redress." ECF No. 17 at 26.

Similarly, Plaintiffs cite no authority for their mistaken proposition that a PIA request is

"not an expression of a grievance requesting any form of redress from the government." ECF No. 17 at 26 (Tex. Gov't Code § 552.021). As alleged in the Amended Complaint, and as reflected in the public information request itself, Defendants sought redress for grievances about Webster and intended to use public information in connection therewith. ECF No. 11 ¶ 46. Defendants cannot at this stage improperly infer that the PIA was unconnected to Plaintiffs' efforts or that a reasonable person would not have been deterred by Defendants' actions. Plaintiffs spoke out to criticize Webster and sought information to confirm evidence of his wrongdoing to pursue claims against him. *Downs v. Borough of Jenkintown*, 2020 WL 2615620, at *7 (E.D. Pa. May 22, 2020) (finding element satisfied "when they publicly criticized the failure of Locke and the Borough to enforce the Zoning Code" and "requested public information"), *order vacated in part on reconsideration sub nom. Downs v. Locke*, 2020 WL 4584003 (E.D. Pa. Aug. 10, 2020), and *aff'd*, 850 F. App'x 158 (3d Cir. 2021).[1] And issuance of notices of purported legal violations "could constitute retaliatory action sufficient to deter a person of ordinary firmness from exercising their constitutional rights." *Id.* (citing *Majer v. Twp. of Long Beach*, 2009 WL 3208419, at *5 (D.N.J. Sept. 30, 2009) (finding a genuine issue of material fact as to whether township's conduct was retaliatory where plaintiff "was issued violation notices and a summons as to his practice of posting 'Open House—For Rent' signs")).

When a plaintiff has exercised rights to seek redress to "urge compliance" with the law, and officials respond with "incidents of harassment" and denial of opportunities to "make a living," the allegations should be allowed to proceed. *Sisk v. Tex. Parks & Wildlife Dep't*, 644 F.2d 1056,

---

[1] The court in *Downs* ultimately granted qualified immunity based on later-adduced summary-judgment evidence upon reconsideration demonstrating that officials had relied on advice of counsel. 2020 WL 4584003, at *6. While such evidentiary disputes are immaterial for present purposes, that distinction is especially inapt because Defendants here do not raise an advice-of-counsel defense.

1057 (5th Cir. 1981). Plaintiffs have alleged at least as much here.

Finally, Defendants fail in their attempt to divorce allegations about the drafting of Webster's email from fair inferences favoring Plaintiffs in the Amended Complaint. Defendants argue, ECF No. 17 at 25, that the "right to petition is generally concerned with expression directed to the government seeking redress of a grievance," *Guarnieri*, 564 U.S. at 388. Defendants concede, ECF No. 17 at 26, that Plaintiffs allege that they "communicat[ed] to the Attorney General, to OAG, and to those in their social and professional circles regarding Webster's corruption," ECF No. 11 ¶ 43. Defendants also acknowledge that the Amended Complaint alleges they "fabricated the email and distributed it to others . . . because of Stone Hilton's public information request." *Id.* ¶ 46. Defendants attempt to portray these allegations as unconnected. ECF No. 17 at 26. But in reality, Plaintiffs allege that Defendants *expressly* discussed retaliating against Plaintiffs in the wake of receiving the PIA request. ECF No. 11 ¶ 27. And that allegation does not negate Plaintiffs' other allegations tending to show a course of conduct culminating in unlawful retaliation by Defendants.

## III. The Well-Pleaded Violation of Plaintiffs' Clearly Established Rights Defeats Any Claim of Qualified Immunity.

Qualified immunity protects Defendants from suit only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Callahan*, 555 U.S. at 231. A plaintiff may defeat qualified immunity by showing "that (1) the official violated a . . . constitutional right . . . (2) [that] was 'clearly established' at the time." *Bevill v. Fletcher*, 26 F.4th 270, 275 (5th Cir. 2022). Here, Defendants are not entitled to qualified immunity. *Contra* ECF No. 17 at 18-37. As explained *supra*, Plaintiffs have plausibly alleged that Defendants violated Plaintiffs' First Amendment rights and unlawfully conspired to do so. Furthermore, Defendants' motion must be dismissed because Plaintiffs' rights were clearly

established. *Contra* ECF No. 17 at 26-29. As in *Bevill*, Defendants' fact-intensive arguments about qualified immunity are inappropriate for resolution at the pleading stage. *See* 26 F.4th at 275.

To be "clearly established," the law need only prohibit a defendant's "conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Courts should define the "clearly established" right at issue on the basis of the "specific context of the case," but at the same time "must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). It is "well established that a government official violates the First Amendment by retaliating against a person for exercising First Amendment rights—that is, by taking 'adverse actions' that are 'substantially motivated against the plaintiffs' exercise of constitutionally protected conduct' that cause the plaintiff "an injury that would chill a person of ordinary firmness from continuing to engage in that [protected] activity.'" *Oliver v. Arnold*, 3 F.4th 152, 160 (5th Cir. 2021); *accord Keenan*, 290 F.3d at 258. Prior cases providing the right's contours need not be factually identical to the case at hand; they must be sufficiently similar to give "reasonable warning that the conduct" at issue violated a right. *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017). Surely the established caselaw provides a reasonable warning to Defendants, some of the OAG's top officials.

As an initial matter, the standard of review all but dictates that the Court reject Defendants' qualified-immunity arguments. Defendants' own authority acknowledges that such fact-based questions are inappropriate for Rule 12(b)(6) dismissal. *See* ECF No. 17 at 19 (citing *Keenan*, 290 F.3d at 258). In *Keenan*, the court held that fact issues precluded summary judgment because it was "impossible to determine whether qualified immunity" existed. 290 F.3d at 262. "Hence, qualified immunity turns on fact issues that must be resolved by further proceedings in the trial

court." *Id.* Likewise, Defendants cite *Suarez*, 202 F.3d at 679, a case determining that the denial of qualified immunity at the summary-judgment stage was inappropriate. *See* ECF No. 17 at 20. Defendants' cases confirm that the fact-intensive nature of the inquiry should be resolved through evidentiary development, not at the pleading stage.

But Defendants' arguments fail in any event. The law is clearly established in Plaintiffs' favor. The allegations more than suffice to allege a violation of that clearly established law. And furthermore, qualified immunity must also be denied because the alleged conduct was neither within the scope of Defendants' authority nor objectively reasonable.

### A.    The law is clearly established in Plaintiffs' favor.

Defendant's own authority also supports Plaintiffs, who have alleged far more than mere "speech" on Defendants' part. *Contra* ECF No. 11 at 20-21. As an initial matter, Defendants cannot maintain at this stage that they in fact engaged in protected "speech" at all. Plaintiffs have alleged that Defendants intentionally created a false and defamatory lie and crafted it into a false official document. It is well-established that false statements with respect to official documents are unprotected as "speech" because they interfere with the proper functioning and respect for government. *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 721 (2012). Insofar as Defendants maintain they engaged in speech, that factual dispute is inappropriate for dismissal at the pleading stage.

Defendants cite *Noonan v. Kane*, 2022 WL 2702153, at *1 (3d Cir. July 12, 2022), for the proposition that claims based purely on protected speech fail "in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow." *Id.* at *6 (quoting *Suarez*, 202 F.3d at 687). According to Defendants, "without the threat of official action, a public official's speech 'does not adversely affect a citizen's First Amendment rights, even if defamatory.'" *Id.* ("Kane's statements did not violate clearly established law when

they were made, as Appellants did not allege that Kane exercised or threatened official action against them. Because those allegations in the complaint do not satisfy the *Suarez* standard, Kane is entitled to qualified immunity on Counts One, Four, and Five."). But where, as here, the "retaliatory disclosure of information" infringes Plaintiffs' constitutionally protected speech rights on core matters of public concern, Defendants' own authority notes an exception. *Cf. id.* at *7 ("Although *Suarez* discussed an exception for the retaliatory disclosure of information that relates to those personal rights that can be deemed fundamental or implicit in the concept of ordered liberty, no one here contends that exchanging pornography via government email accounts is such a personal right." (cleaned up)); *see also First Nat'l Bank v. Bellotti*, 435 U.S. 765, 776 (1978) (stating that speech on matters of public concern is "at the heart of the First Amendment's protection"). At a minimum, fact questions about Plaintiffs' "personal right[s]" would require evidentiary development precluding dismissal. *Noonan*, 2022 WL 2702153, at *7.

Likewise, even assuming "[i]t is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action," as stated in authority Defendants incorrectly insist applies, *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001); *see* ECF No. 17 at 20, Plaintiffs have alleged much more. For instance, Plaintiffs have alleged that "Webster had previously instructed, persuaded, coerced, or encouraged Jordan Eskew . . . to pursue meritless claims of sexual harassment against Plaintiffs with the Texas Workforce Commission," and subsequently leaked the defamatory email in violation of public-information law. ECF No. 11 ¶ 34. Defendants cannot maintain that Plaintiffs failed to allege that Defendants took steps to "threaten" or "coerce" a third party to act. *McLaughlin*, 271 F.3d at 573. Defendants simply dispute the factual veracity of events surrounding these allegations.

Moreover, Plaintiffs alleged deliberate actions in concert by Defendants far outside the

scope traditionally reserved for qualified immunity, which typically will "involve excessive force, or split-second decisions, or the chaos of a chase." *Heidi Grp., Inc. v. Tex. Health & Hum. Servs. Comm'n*, 138 F.4th 920, 933 (5th Cir. 2025) (quoting *Hughes v. Garcia*, 100 F.4th 611, 620 n.1 (5th Cir. 2024)). Defendants make the common mistake of insisting that Plaintiffs identify an on-all-fours-case mirroring the exact facts of this case. But the law imposes no such requirement. All officials—especially those leading the State's lawyers responsible for litigating qualified immunity on behalf of countless Texas officials—know the clearly established rule that applies at all times: "Do not lie." *Hughes*, 100 F.4th at 620 n.1.

The notion that Texas officials believe they are at liberty to conduct coordinated meetings to fabricate evidence for the express purpose of retaliating against disfavored speech is appalling. "The law is clear on this, and to the extent there is no case directly on point, that is likely because no one has tried to make such absurd arguments." *The Heidi Grp., Inc. v. Tex. Health & Hum. Servs. Comm'n*, 2023 WL 2717968, at *10 (W.D. Tex. Jan. 31, 2023), *report and recommendation adopted sub nom. Heidi Grp., Inc. v. Texas Health & Hum. Servs. Comm'n*, 2023 WL 2733402 (W.D. Tex. Mar. 30, 2023), *aff'd in relevant part*, 138 F.4th 920 (5th Cir. 2025). After all, "a plaintiff need not point to 'a case directly on point for a right to be clearly established'" if "'existing precedent . . . placed the statutory or constitutional question beyond debate.'" *Rivas Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). Defendants admit that "overcoming qualified immunity does not require a case directly on point"—and even if more authority required, Defendants' own reliance on summary-judgment case law confirms that dismissal at this stage is unwarranted. ECF No. 17 at 27 (citing *Hanks v. Rogers*, 853 F.3d 739, 746-47 (5th Cir. 2017)).

In this Circuit, "the law has long been clearly established that government officials cannot retaliate against ordinary citizens for exercising their First Amendment rights." *Round Rock Indep.*

*Sch. Dist. v. Amy M.*, 540 F. Supp. 3d 679, 701 (W.D. Tex. 2021) (citing *R.S. ex rel. Smith v. Starkville Sch. Dist.*, 2013 WL 5295685, at *8 (N.D. Miss. Sept. 19, 2013); *Keenan*, 290 F.3d at 258 (explaining the First Amendment prohibits "adverse governmental action against an individual in retaliation for the exercise of protected speech activities"). For instance, *Kinney v. Weaver*, 367 F.3d 337, 358 (5th Cir. 2004), explains that "the First Amendment is violated in 'ordinary citizen' cases if the individual engaged in conduct protected by the First Amendment and the government took action against the person because of that protected conduct." Although Defendants cite *Kinney*, that case supports Plaintiffs because it rejected officials' claim of qualified immunity based on the summary judgment record in that case. *Contra* ECF No. 17 at 28. Plaintiffs' allegations suffice at this stage, particularly because there is no conceivable government "interest" in fabricating sham investigations because of speech-based personal animus. *Kinney*, 367 F.3d at 362.

The clearly established law prohibiting retaliation by government actors for the exercise of ordinary citizens' First Amendment rights defeats qualified immunity. *See R.S. ex rel. Smith*, 2013 WL 5295685, at *8. Any reasonable official would have understood that lodging a fake sexual-harassment charge and backdating an investigation into it as a basis for Plaintiffs' termination was a violation of the law. *See, e.g.*, *Round Rock*, 540 F. Supp. 3d at 701 (lodging "improper criminal truancy charges against a parent in retaliation for that parent's advocacy of her disabled daughter is a violation of the law"). And because Plaintiffs have alleged that the Defendants made false statements about a sham investigation that was "impermissible and inapplicable" as to Plaintiffs, Defendants cannot claim to enjoy qualified immunity. *Id.*

## B. Plaintiffs have sufficiently alleged a violation of their rights that overcomes qualified immunity at this stage.

Plaintiffs' specific allegations also refute qualified immunity. "The First Amendment

prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan*, 290 F.3d at 258. As alleged here, there are no competing interests to "balance." *Id.* at 261 n.7. To state a retaliation claim under the First Amendment in cases brought by "ordinary citizens," plaintiffs must allege "that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Id.* at 258.

Even if not all retaliatory acts are "actionable as a violation of the First Amendment;" Defendants cannot maintain that the intrusions here were "too trivial or minor" to plausibly allege an actionable chill on Plaintiffs' constitutional rights. *Id.* Defendants' own authority confirms that the allegations clear this threshold. *Contra* ECF No. 17 at 23 (citing *O'Neal v. Falcon*, 668 F. Supp. 2d 979, 987 (W.D. Tex. 2009); *Hemphill v. City of Monahans*, 2019 WL 13401718, at *3 (W.D. Tex. Sept. 13, 2019)). *O'Neal* explains that "a plaintiff need not actually be deprived of her First Amendment rights in order to establish First Amendment retaliation." 668 F. Supp. 2d at 987. And in *Hemphill*, there were insufficient allegations of "temporal proximity" that would "allow one to infer motivation and causation." 2019 WL 13401718, at *3. Here, by contrast, Plaintiffs have alleged in detail how and when Defendants responded to Plaintiffs' speech and petitioning activity.

Defendants' factual disputes about the extent to which Plaintiffs' speech was curtailed are inappropriate at this stage. *Contra* ECF No. 17 at 23-24 (citing cases). As the Fifth Circuit has noted (and citing authorities upon which Defendants rely), at the pleading stage, the plaintiff must allege that he "reduced or changed his exercise of free speech." *McLin v. Ard*, 866 F.3d 682, 697

(5th Cir. 2017). Plaintiffs meet this minimal pleading standard, as they allege their channels for protesting Webster's corruption were reduced or changed—indeed, Defendants effectively concede as much by highlighting allegations that Plaintiffs "expected they would use the documents they received as part of a case to the Attorney General—and, if needed, the public— regarding Webster's corruption," ECF No. 11 ¶ 26, yet Defendants' actions caused Plaintiffs to change tack and "report[] all relevant details to the State Bar and the appropriate authorities," ECF No. 17 at 23 (quoting ECF No. 11 ¶ 20).

The fact-intensive nature of the dispute renders dismissal inappropriate at this stage. "To be actionable in the private context, there must be an 'adverse effect' caused by the retaliatory act." *Reitz v. City of Abilene*, 2017 WL 3046881, at \*22-23 (N.D. Tex. May 25, 2017), *report and recommendation adopted*, 2017 WL 3034317 (N.D. Tex. July 17, 2017) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005)). Whether an effect is adverse depends on the context. *Id.* Regardless of context, however, the act must "deter a person of ordinary firmness from exercising his or her First Amendment rights." *Id.* This is a "fact-intensive inquiry that considers the status of the speaker and retaliator, the relationship between them, and the nature of the alleged retaliatory acts." *Id.* (quoting *Suarez*, 202 F.3d at 686). Whether actions of a defendant "caused an injury sufficient to chill the speech of a person of ordinary firmness is a particularly factual analysis that turns on the extent and nature of the injury." *Id.* (quoting *Bailey v. City of Jasper*, 2012 WL 4969126, at \*4 (E.D. Tex. Sept. 24, 2012), *recommendation adopted*, 2012 WL 4970809 (E.D. Tex. Oct. 17, 2012)). Here, the speakers are private citizens and the retaliators are OAG officials. *See id.* On the facts alleged, their actions were "sufficient to chill a person of ordinary firmness from exercising his right to freedom of speech." *Id.* The law clearly prohibits such actions.

Plaintiffs have specifically alleged that Webster, Molina, and Reno conspired to retaliate

against Plaintiffs for seeking public records tending to prove Webster's corruption and corroborating efforts of Stone and Hilton to speak out against it. ECF No. 11 ¶¶ 4, 27-28, 46. Plaintiffs pointedly ignore these allegations. At this stage, given the deferential pleading standard, dismissal based on disputed facts is inappropriate—all that matters is "what [the plaintiff] alleges." *Sawyer v. Charles*, 2022 WL 912215, at *9 (E.D. La. Mar. 29, 2022) (citing *Cantrell v. City of Murphy*, 666 F.3d 911, 922 (5th Cir. 2012)); *see also id.* ("Warden Robinson should have intervened in the transfer in light of Sawyer's medical issues but declined to do so in retaliation for Sawyer's activity in filing numerous grievances . . . then an official in Warden Robinson's position would have known that under clearly established law this would violate Sawyer's First Amendment rights and doing so would have been objectively unreasonable.").

The allegations that Defendants do acknowledge, ECF No. 17 at 28, likewise support Plaintiffs. First, Defendants state that Webster "prepared an internal email regarding safety concerns," *id.*, when in reality, Plaintiffs have alleged that Defendants concocted a lie and papered it up months after the fact in order to harm Plaintiffs. Any reasonable official would have understood that doing so "knowingly violate[d]" Plaintiffs' constitutional rights. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Likewise, Defendants cannot recast the well-pleaded allegation Molina, who served a vital role in the conspiracy by corroborating Webster's lie after the fact to give it cover and the false appearance of having been conducted contemporaneously. ECF No. 11 ¶¶ 31-32. This is not "no conduct" on Molina's part. *Contra* ECF No. 17 at 28. It is based on a pattern of Defendants' behavior observed by Plaintiffs during their personal experience working with them, ECF No. 11 ¶ 31, an allegation that Defendants conveniently ignore. Likewise, any reasonable official in Reno's position would have understood that fabricating pretextual law-enforcement grounds to paper a fictitious safety concern was unlawful. ECF No. 11 ¶ 32.

Defendants likewise ignore this allegation in claiming that nothing put Defendants on notice that their conduct was unlawful. For instance, Defendants ignore—and thus concede—Plaintiffs' allegation that "Webster, Molina, and Reno all knew or should have known that fraud, waste, and abuse of taxpayer resources would violate OAG policy or Texas law." *Id.*

Thus, Defendants find no support in their contention that the "Fifth Circuit has held that 'false accusations' and 'defamation' do not constitute actionable retaliation under the First Amendment." ECF No. 17 at 28. Plaintiffs have plausibly alleged that Defendants knew they were falsifying a record after the fact to create the fictitious appearance of having investigated Plaintiffs. Insofar as Defendants dispute that allegation, such fact-intensive inquiries are within the scope of summary judgment arguments, not Rule 12(b)(6). The Court should likewise reject Defendants' suggestion that mere assertions of purported "safety" fears can justify qualified immunity. ECF No. 17 at 28-29. Plaintiffs have alleged that Defendants' safety concerns were pretextual and Defendants cite no authority to the contrary.

The Complaint properly alleges that the motivation for adverse action against Plaintiffs was retaliation for the exercise of First Amendment activity in investigating and speaking out against Webster's wrongdoing. Defendants' dispute of that theory is inappropriate for dismissal at the pleading stage, as it is a fact-intensive argument about Defendants' motivations. Rather than following the correct pleading-stage standard, Defendants at most dispute whether the finder of fact will eventually agree that the officials' "subjective motivation [was] the but-for cause of the adverse action against the plaintiff." *Rusanowsky v. City of Dallas*, 2025 WL 855317, at *4 (5th Cir. Mar. 19, 2025). Webster contends that the disputed actions were based on a "mutual enmity" insufficient to show a connection to the challenged First Amendment activity. ECF No. 17 at 28. However, Defendants ignore that Plaintiffs, based on personal experience from working closely

with Webster, have made allegations linking the enmity and resulting conduct to speech. ECF No. 11 ¶ 31.

Defendants' factual disputes about participation in Webster's retaliatory scheme are similarly inappropriate for resolution on the pleadings. *Contra* ECF No. 17 at 28-32. Defendants dispute that Plaintiffs alleged the necessary "action" by Molina. *Id.* at 28 (quoting *Iqbal*, 556 U.S. at 676). Molina and Reno are liable for their "participation in the wrong alleged." *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986). It is well-established that engaging in concerted activity the participants know to be unlawful will support liability. *E.g.*, *United States v. Guerrero*, 114 F.3d 332, 342 (1st Cir. 1997) ("[W]here, as here, a defendant actively participates in a venture, but denies any knowledge of the venture's illegal nature, the government must adequately prove knowledge, more so than participation."); *see also United States v. Richar*d, 775 F.3d 287, 295 (5th Cir. 2014) (rejecting a defendant's challenge to conspiratorial intent based in part on the defendant's meeting attendance). The Amended Complaint alleges at least as much if not more. The Amended Complaint alleges how Defendants met together expressly to retaliate against Plaintiffs, and how Molina's participation was crucial because he is alleged to have witnessed false events, and based on common practice of the Defendants, such formalized writings would have memorialized an agreement among Defendants to harm Plaintiffs. ECF No. 11 ¶¶ 31-32. And Defendants' insistence that Reno was merely "performing a routine job function" regarding a supposed "safety assessment" simply ignores the Complaint's allegations. ECF No. 17 at 28. The Complaint alleges how Webster functionally exercised control over law-enforcement decisions, how Reno cooperated with Webster to advance his own self-interest, and how Reno's acts were outside the scope of any of his official duties. ECF No. 11 ¶¶ 4, 17, 32, 36, 47. Defendants may raise such arguments, if at all, at trial—and in any event only after factual development to

determine whether a genuine issue of material fact exists as to Defendants' improper motivations. At this stage, Defendants are not entitled to qualified immunity.

### C. Plaintiffs have also alleged that Defendants' actions were objectively unreasonable and outside the scope of any discretionary authority—facts equally fatal to qualified immunity.

Nor can Defendants claim that the acts were within the scope of any discretionary authority or objectively reasonable. A defendant cannot assert qualified immunity unless he proves that the "challenged conduct was within the scope of his discretionary authority." *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 318 (5th Cir. 2019). The Complaint alleges that Defendants were following Webster's orders solely to advance their self-interest and thus not exercising acts within the boundaries of their official capacities. Officials act within the scope of their discretionary authority when they "perform[ ] non-ministerial acts within the boundaries of [their] official capacit[ies]." *Bevill*, 26 F.4th at 275. Defendants have failed to meet their "burden of showing" that their actions were within the scope of any discretionary authority. *Cherry Knoll*, 922 F.3d at 318. Because Defendants are unable to prove that they acted within their discretionary authority, they cannot claim qualified immunity. *See id.* Given this highly fact-intensive inquiry, it is inappropriate to determine that Defendants are "entitled to the protection of qualified immunity at the Rule 12(b)(6) stage." *Id.* And *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982), is not to the contrary though cited by Defendants, ECF No. 17 at 18. Rather, as that case was decided in a summary-judgment posture, *Harlow* favors denying the motion to dismiss as well.

The allegations showing that Defendants' conduct was not objectively reasonable will also defeat a qualified-immunity claim. *See Cherry Knoll*, 922 F.3d at 318. It is "clear that 'government retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable.'" *Reitz v. City of Abilene*, 2017 WL 3046881, at *23 (quoting *Keenan*, 290 F.3d at 261-62). In the criminal context, "qualified immunity largely depends on the existence of probable

cause." *Id.* "If no reasonable police officer could have believed that probable cause existed for the law enforcement actions . . . against the plaintiff[ ], then their retaliation violated clearly established law in this circuit." *Id.* (quoting *Keenan*, 290 F.3d at 262). That was the situation on the facts alleged in *Reitz*. *Id.* And it should apply with equal force here, where Plaintiffs have plausibly alleged that no reasonable official could have believed a legitimate basis for a law-enforcement "threat assessment" existed. ECF No. 11 ¶ 32.

Qualified immunity fails when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates" the rights alleged. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271 (1997). Here, the First Amendment by itself is clear that warrantless searches are unconstitutional even without the body of caselaw specific to various forms of official retaliation. Whether viewed with or without that body of caselaw, every reasonable official would know that it is unlawful to punish criticism of public corruption and public-information requests designed to prove the same by launching a sham "security" response based on fake, backdated results of an investigation that never happened.

And furthermore, any reasonable official should have known that retaliating against Plaintiffs for their protected speech was unlawful—a fact even more alarming given that OAG is the State agency responsible for litigating qualified immunity on behalf of countless officials across Texas. When, as here, the "nature of the dispute centers on factual dispute about [Defendants'] intent," it is improper to conclude at this stage that the challenged actions were

"objectively reasonable under clearly established law." *Blackwell v. Laque*, 275 F. App'x 363, 370 (5th Cir. 2008) (per curiam).

**IV.    Each First Amendment and Conspiracy Claim in the Amended Complaint Satisfies the Minimal Pleading Standards.**

As explained above, Plaintiffs have plausibly alleged violations of the First Amendment and further that Defendants violated Plaintiffs' clearly established rights. These allegations necessarily refute Defendants' suggestion, ECF No. 17 at 29-30, that the Complaint fails to state a claim for which relief can be granted. Because the allegations further suffice to allege conspiracy claims based on the participation of Molina and Reno, the Court should reject Defendants' arguments that Plaintiffs allege no participation of Molina and Reno, that the conspiracy claims (Count II and Count IV) should be dismissed for failure to state a claim, and that Plaintiffs fail to allege harm. *Contra id.* at 29-37.

**A.    The allegations against Molina and Reno show conscious cooperation and participation with Webster to harm Plaintiffs.**

The allegations against Molina and Reno are sufficient. *Contra id.* at 29-32. Defendants have pleaded that "each Government-official defendant, through his own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. In *Iqbal*, for instance, the Court rejected purposeful discrimination as simply knowledge or awareness of consequences of another's actions and emphasized that it implicates a decisionmaker's adoption of a policy "because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* at 681 (internal quotations omitted). Defendants merely ignore key allegations in the complaint in contending that standard has not been met here. *Contra* ECF No. 17 at 29-30.

With respect to their contention that the response to "expression" was somehow proper, Defendants contend that "the initiation of an investigation" and "implementation of institutional safeguards" were within the scope of Defendants duties. *Contra id.* at 30. The roles played by

Defendants, as alleged, do not "reflect core prosecutorial and investigative functions," *id.* at 30, but rather sycophantic attempts to advance individual self-interest by fabricating evidence against Plaintiffs. Defendants likewise ignore allegations that each Defendants' role in the conspiracy was essential because, without it, Webster's fictitious back-dating and mock security concerns would have been readily apparent. *Contra id.* at 30-32. At this stage, the Court must reject Defendants' inference that Molina and Reno did not take "specific action." *Id.* at 31. Instead, the Court must credit the inference in the Complaint that favors Plaintiffs—Molina and Reno shared Webster's aims to harm Plaintiffs and acted accordingly. This is especially so with respect to Reno, for while it should be true that the Deputy Attorney General for Criminal Justice is responsible for conducting genuine threat assessments an overseeing the Agency's "criminal law functions, including supervision of investigations and prosecutions," *id.* at 32, Plaintiffs have alleged that Webster effectively controlled these functions and the *sui generis* shared plot to harm Plaintiffs and their business far exceeded any proper official duties. And specifically, Plaintiffs have alleged how Defendants wrongfully misused the "threat assessment" and "coordinating security measures" to harm Plaintiffs for Defendants' personal benefit. *Id.*; *see, e.g.*, ECF No. 12 ¶ 32.

### B.   The Complaint sufficiently alleges plausible conspiracy allegations.

Plaintiffs have alleged an actionable conspiracy to violate § 1983 because they have alleged an agreement to misuse official power under color of state law to deprive individuals of their federal rights. *See* ECF No. 17 at 35 (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)). "To state a claim, a plaintiff must allege the existence of "(1) an agreement to do an illegal act and (2) an actual constitutional deprivation." *Whisenant v. City of Haltom City*, 106 F. App'x 915, 917 (5th Cir. 2004) (per curiam) (citing *Cinel*, 15 F.3d at 1338).

For the reasons above, the Court should reject out of hand any notion that the conspiracy claims fail because "Reno and Webster acted reasonably, and Molina did not act at all." ECF No.

17 at 34. The Defendants' actions were not "objectively reasonable," and therefore Defendants cannot avoid Plaintiffs' conspiracy claims. *Id.* at 33 (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990), *abrogated on other grounds by Duckett v. City of Cedar Park*, 950 F.2d 272 (5th Cir. 1992)). Applying this standard correctly, the conspiracy claims against Defendants may not be dismissed because the underlying constitutional violations are properly pleaded as well.

The intra-corporate conspiracy doctrine is likewise unhelpful to Defendants. *Contra id.* at 34-36. Defendants contend that there cannot be a conspiracy because Reno and Molina allegedly participated in a conspiracy with Webster to deprive Plaintiffs of their First Amendment rights in violation of 42 U.S.C. § 1983, yet "officers of the same organization . . . can[not] legally conspire with one another." ECF No. 17 at 35. An "exception to the intracorporate conspiracy doctrine exists where corporate employees act for their own personal purposes." *Thompson v. McGehee*, 761 F. Supp. 3d 937, 951 (N.D. Tex. 2025) (quoting *Benningfield v. City of Houston*, 157 F.3d 369, 379 (5th Cir. 1998)). Plaintiffs have alleged that Reno and Molina exceeded any proper scope of their official duties in serving their own self-interest—relating both to their personal fealty to Webster and to their own personal disdain for Plaintiffs and their speech—and therefore cannot benefit from the intra-corporate conspiracy doctrine. Defendants cite cases for the proposition that individuals employed by the same law-enforcement agency are incapable of conspiring despite being sued in their individual capacities. *See* ECF No. 17 at 35-36. But the Amended Complaint's allegations, which must be taken as true, portray a scenario far beyond one in which a plaintiff attempts to avoid the doctrine merely by suing defendants in their individual capacity. *See, e.g.*, *id.* at 35 (citing *Angelle v. Town of Duson*, 2018 WL 4649788, at *9 (W.D. La. Aug. 7, 2018) (unlike here, noting absence of allegations that defendants "(1) had an independent stake in

achieving the object of the conspiracy; (2) acted for their own personal purposes; or (3) acted

outside the scope of their employment"), *adopted*, 2018 WL 4624114 (W.D. La. Sept. 26, 2018))).

### C.    Defendants caused Plaintiffs' injury.

Plaintiffs have alleged injury consistent with the Federal pleading requirements and Article

III of the Constitution. *Contra id.* at 36-37. The allegations and the inferences therefrom support a

"right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And Defendants were the

actual cause of the injury that Plaintiffs have alleged. *Cf. Victoria W. v. Larpenter*, 369 F.3d 475,

482 (5th Cir. 2004) (explaining causation). A request for nominal damages satisfies Article III

standing where a plaintiff's claim is based on a completed violation of a legal right; even nominal

damages can redress First Amendment violations if the plaintiff "cannot or chooses not to quantify

that harm in economic terms." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 293 (2021). Both

nominal and punitive damages are recoverable in a civil rights action notwithstanding the absence

of compensatory damages. *Paulson v. Collier*, 2024 WL 4379736, at *6 (E.D. Tex. July 23, 2024),

*report and recommendation adopted sub nom. Paulson v. TDCJ*, 2024 WL 4346376 (E.D. Tex.

Sept. 27, 2024) (citing *Boyd v. Driver*, 495 F. App'x 518, 524 (5th Cir. 2012)); *see also Hutchins*

*v. McDaniels*, 512 F.3d 193, 197 (5th Cir. 2007)) ("[P]unitive damages may stand in the absence

of actual damages where there has been a constitutional violation.") (quoting *Williams v. Kaufman*

*Cnty.*, 352 F.3d 994, 1015 (5th Cir. 2003)); *Williams*, 352 F.3d at 1014 ("The law is well-

established in this Circuit that plaintiffs may recover nominal damages when their constitutional

rights have been violated but they are unable to prove actual injury.").

The allegations also fairly support inferences of harm to Plaintiffs. *Contra* ECF No. 17 at

36-37. Defendants "negatively impacted Plaintiffs' ability to capitalize on their years of combined

experience at OAG" and damaging their marketability. ECF No. 11 ¶ 22. Plaintiffs directly link

this to allegations explaining how Webster attempted to harm Plaintiffs to remove them as a threat

to his own personal employment prospects. *Id.* ¶¶ 21-22. Moreover, Defendants never dispute that Plaintiffs allege they have lost a business opportunity because of defendants—only that it "occurred before the submission of the PIA request or any alleged retaliatory conduct." ECF No. 17 at 36. But Defendants ignore the course of conduct alleged. Any timing dispute is appropriate for factual development and presentation at trial, not pleading-stage dismissal.

**V.   Dismissal for Want of Jurisdiction Is Improper Because Plaintiffs Have Standing.**

Plaintiffs have standing to assert their claims under the federal jurisdiction rules. Rule 12(b)(1) authorizes a federal court to dismiss a claim for lack of subject-matter jurisdiction. But Plaintiffs have properly invoked this Court's jurisdiction. *Contra id.* at 37-41. Defendants' standing arguments effectively asks that the Court "disregard Plaintiffs' version of the facts in favor of [Defendants'] version of the facts." *KEM Constr., LTD. v. Colossal Contracting, LLC*, 2024 WL 1747651, at *3 (W.D. Tex. Apr. 23, 2024). Considering the "well-known Rule 12(b)(6) standard, the Court [should] not dismiss Plaintiffs' claims for lack of standing based on disputed facts." *Id.*

As an initial matter, the Court should reject Defendants' argument that the alleged injury predates Defendants' retaliation for the reasons explained above. *Contra* ECF No. 17 at 38-39. Defendants do not dispute that Plaintiffs allege reputational harm and the loss of a potential client to Stone Hilton. *See* ECF No. 11 ¶ 24; *see also id.* ¶ 45 ("Defendants' actions—from Webster's interference with Stone Hilton's business to their composition and planned release of the email designed to slander Plaintiffs—have inflicted reputational and economic injuries."). Instead, Defendants complain that the harms are "asserted collectively" and the disputed email references Stone individually. ECF No. 17 at 38. Once again, this argument improperly asks the Court to draw inferences in Defendants' favor. At this stage, dismissal is unwarranted because the parties' dispute references an ongoing course and the circumstances of Plaintiffs' departure from OAG—all of

which are implicated in Defendants' scheme to retaliate against Plaintiffs as well as the fabricated evidence Defendants produced to support it.

The Court should also reject any suggestion that Stone Hilton lacks standing. *Contra* ECF No. 17 at 40-41 (citing *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 896 (5th Cir. 1968), for "[t]he general rule . . . that an action to redress injuries to a corporation, whether arising out of contract or tort, cannot be maintained by a stockholder in his own name but must be brought in the name of the corporation."). As current shareholders of Stone Hilton PLLC and principals of the firm at all times relevant to this case, Plaintiffs have alleged facts sufficient to support standing to pursue claims on Stone Hilton's behalf. ECF No. 11 ¶¶ 7-8, 20, 27, 57. Stone and Hilton allege that they have owned their membership interest in Stone Hilton PLLC throughout all times relevant to this lawsuit and are able to fairly and adequately represent the interests of Stone Hilton PLLC. *Id.* ¶¶ 7-8. Defendants offer no reason to doubt the ability of Stone or Hilton to pursue claims on behalf of Stone Hilton PLLC. *Cf., e.g.*, *In re LoneStar Logo & Signs, LLC*, 552 S.W.3d 342, 349-51 (Tex. App. 2018) (noting restrictions of a *former* member to assert claims on behalf of an LLC). Defendants thus cannot prevail in arguing that dismissal is required because Stone Hilton is purportedly "the sole plaintiff with any plausible claim of injury from lost business." ECF No. 17 at 39.[2]

The Court must likewise reject Defendants' fact dispute, *id.*, about whether Reno and Molina participated with Webster in service of Webster's use of "official authority within OAG to communicate to the client that they should not hire Stone Hilton," ECF No. 11 ¶ 24. Defendants draw the inference that the Complaint alleges "no conduct by Molina or Reno related to this

---

[2] Defendants make passing reference to an argument that Stone Hilton suffered no injury in fact. ECF No. 17 at 39 n.13. But by relegating that argument to a footnote, Defendants have forfeited it.

incident," ECF No. 17 at 39. However, that inference is unreasonable given the alleged participation of Molina and Reno in the scheme and shared goal to harm Plaintiffs' professional standing for their own benefit. *See, e.g.*, ECF No. 11 ¶¶ 17, 25, 46-48. For similar reasons, the Court must reject Defendants' misguided insistence that "all allegations of wrongful conduct are attributed to Webster." ECF No. 17 at 40.

The Complaint also alleges sufficient reputational harms to survive dismissal. *Contra id.* at 39-41. Plaintiffs have alleged far more than "generalized assertions that their reputations have been harmed." *Id.* at 39 (citing *Copeland v. Internal Revenue Svcs.*, 2021 WL 3713071, at *4 (N.D. Tex. Aug. 4, 2021). *Copeland* is inapposite because that case involved a pro se litigant's complaint about tax officials generally, not specific reputational damage to established attorneys and their law firms. *See* 2021 WL 3713071, at *4. Defendants have not alleged mere harms to reputations generally—they are lawyers who have alleged harm to their reputations as leading practitioners in the State with particularly valuable experience in state government. ECF No. 11 ¶¶ 19-22. Defendants' actions were calculated to and did harm Plaintiffs' reputations.

Moreover, Defendants are all licensed attorneys and well-familiar with "the concept of professional reputation and how acts of dishonesty or unprofessionalism may negatively impact their reputations," as all lawyers know or should know that the "potential injury to the reputation of dishonest lawyers could be monumental." *Susan M. Chesler, Training for Tomorrow an Introduction to Negotiations for Future Transactional Lawyers*, BUS. L. TODAY, Apr. 2011, at 1, 3. Plaintiffs allege that Defendants specifically portrayed false allegations of misconduct to damage their professional standing and make them appear dishonest or untrustworthy. ECF No. 11 ¶ 48 (alleging that Defendants' false and salacious allegations implicated Plaintiffs' "sound judgment, credibility, respectability, competence, and adherence to the law"); *see also In re KSRP,*

*Ltd*, 2011 WL 13096691, at *15 (Bankr. S.D. Tex. Aug. 17, 2011) ("Accusations of dishonesty are particularly harmful to attorneys, whose advocacy of clients depends on a reputation for credibility."), *report and recommendation adopted sub nom. Collins v. Sidharthan*, No. CV M-11-247, 2014 WL 11531796 (S.D. Tex. Sept. 30, 2014), *aff'd sub nom. In re KSRP, Ltd.*, 809 F.3d 263 (5th Cir. 2015). And because damage to that professional reputation "is difficult to quantify, the law allows the factfinder to presume damages to compensate for that damage." *Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1331 (5th Cir. 1993).

It is thus similarly immaterial whether the Complaint alleges "injury to Hilton's personal reputation" specifically. *Contra* ECF No. 17 at 41. Defendants attempt to distinguish allegations regarding Hilton from "allegedly defamatory statements cited as harmful pertain specifically to Stone." *Id.* at 41. Of course, Defendants do not dispute that Stone and Hilton are business associates and principals of their law firm, Stone Hilton PLLC. It is obvious that harm to Stone Hilton harmed both Stone and Hilton. But even were it otherwise, Plaintiffs also allege that "Stone *and Hilton* categorically deny" that they resigned from OAG due to sexual-harassment allegations. ECF No. 11 ¶ 28 (emphasis added). Because Webster's letter claims otherwise, at a minimum, that factual dispute cannot be resolved at the pleading stage.

## CONCLUSION AND PRAYER

The Court should deny Defendants' Motions to Dismiss.

Respectfully submitted.

*/s/ J. Stephen Toland*
J. STEPHEN TOLAND
STATE BAR NO. 24029863
STEPHEN@TOLANDLEGAL.COM
TOLAND LAW FIRM, PLLC
1305 SAN ANTONIO STREET
AUSTIN, TX 78701
TELE: (512) 621-9545
FACSIMILE: (512) 612-9613
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that this document was served on all counsel of record on October 31, 2025, via the Court's CM/ECF system.

*/s/ J. Stephen Toland*
J. Stephen Toland

36